UNITED STATES of America,
Plaintiff–Appellant,

v.

A. LANOY ALSTON, D.M.D., P.C.; Ronald D. Walker; Desert Valley Dental, Ltd.; Richard B. Meyer; Aaron L. ("Lanoy") Alston, Defendants–Appellees.

No. 91–10040.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 1991.

Decided Sept. 11, 1992.

Mary K. Logan, Thomas H. Boerschinger, American Dental Ass'n, Chicago, Ill., Kirk B. Johnson, Edward B. Hirshfeld, Michael L. Ile, American Medical Ass'n, Chicago, Ill., Jack R. Biereg, Richard D. Raskin, Sidley & Austin, Chicago, Ill., Mark E. Haddad, Paul E. Kalb, Sidley & Austin, Washington, D.C., for amici curiae American Dental Ass'n and American Medical Ass'n.

Before: FLETCHER, WIGGINS and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

We examine three dentists' criminal antitrust convictions.

### Background

Aaron Lanoy Alston, Richard B. Meyer and Ronald D. Walker provide dental services for members of prepaid dental plans in Tucson, Arizona.[1] They and other providers receive two kinds of payments: capitation fees, which are paid by the plans to the dentists based on the number of plan-member patients they see, and co-payment fees, which are paid by the patients to the dentists based on the services performed. The plans, not the dentists, determine both fee amounts.

Co-payment fees in Tucson had not risen for ten years, although they had in other cities, including nearby Phoenix. Some Tucson dentists were failing to break even on the most commonly performed services, such as porcelain crowning. Several Tucson dentists had individually approached the plans about increasing the fee schedule; their efforts proved unsuccessful. Drs. Alston, Meyer and Walker were among the dentists who felt the fees were too low. They met with about fifty local dentists at Dr. Alston's office to discuss the fees, after which many of those present at the meeting mailed letters to the plans requesting

James F. Rill, Asst. Atty. Gen., Charles A. James, Deputy Asst. Atty. Gen., John J. Powers, III, Andrea Limmer, U.S. Dept. of Justice, Washington, D.C., (Robert E. Bloch, Ann Lea Harding, James F. Shalleck, Jessica Cohen, Dept. of Justice, Washington, D.C., of counsel), for plaintiff-appellant U.S.

Stephen M. Weiss, Karp, Stolkin & Weiss, Tucson, Ariz., for defendants-appellees Aaron Lanoy Alston and A. Lanoy Alston, D.M.D., P.C.

Frederic J. Dardis, Dardis & Hippert, Tucson, Ariz., for defendant-appellee Richard B. Meyer.

Peter B. Keller, Keller, Postero & Hall, Tucson, Ariz., for defendants-appellees Ronald D. Walker and Desert Valley, Ltd.

1. Drs. Alston and Walker do business as corporations, which are also defendants; all references to the individuals include their corporations.

higher fees.[2] The plans did in fact revise their fee schedules, resulting in higher costs to plan members for some services.

This practice drew immediate fire from the Justice Department, which obtained an indictment against Alston, Meyer and Walker for conspiring to fix prices in violation of section 1 of the Sherman Act.[3] The jury convicted all three defendants, but the district court granted judgments of acquittal notwithstanding the verdict to Meyer and Walker and a new trial to Alston. *United States v. Alston,* 1991–1 Trade Cas. ¶ 69,366 (D.Ariz.1990). The government appeals.[4]

### Discussion

### I

We begin with the Supreme Court's most recent per se case, *FTC v. Superior Court Trial Lawyers Association,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (*SCTLA*). About 100 private lawyers in Washington, D.C., regularly served as court-appointed attorneys for indigent defendants. More than 90 percent of them agreed to stop providing legal representation until the District of Columbia government increased their compensation. Because of the boycott's detrimental effect on the quality of criminal justice, the District government acceded to the lawyers' demands. The Federal Trade Commission

brought a civil action against SCTLA, alleging that the boycott constituted an unfair method of competition in violation of section 5 of the FTC Act.[5] After hearings before an ALJ, the Commission and the D.C. Circuit, the case came before the Supreme Court. The Court held that the lawyers' boycott was "a plain violation of the antitrust laws," 493 U.S. at 428, 110 S.Ct. at 778, and that it was prohibited per se.

■ In so holding, the Court made clear that the per se condemnation of price fixing is a substantive rule of antitrust law, not merely a device of administrative convenience: "The *per se* rules are, of course, the product of judicial interpretations of the Sherman Act, but the rules nevertheless have the same force and effect as any other statutory commands." *Id.* at 432–33, 110 S.Ct. at 779–80. Price fixing is illegal regardless of pro-competitive justifications offered therefor: "[I]t is not our task to pass upon the social utility or political wisdom of price-fixing agreements," *id.* at 421–22, 110 S.Ct. at 774; "[e]very such horizontal arrangement among competitors poses some threat to the free market," *id.* at 434, 110 S.Ct. at 781; "[price-fixing agreements] are all banned because of their actual or potential threat to the central nervous system of the economy," *id.* at 435, 110 S.Ct. at 781 (quoting *United States v. Socony–Vacuum Oil Co.,* 310

---

**2.** The exact agenda and purpose of the meeting is disputed. The government contended, and the jury apparently found, that the dentists met with the intention of exerting pressure on the plans to increase fees. The dentists claimed, however, that the topic of the meeting was a new co-payment schedule *proposed by the plans,* and that the letter-writing campaign was undertaken at the behest of the president of one of the plans as a pro forma "show of force" to help the plans justify increasing the fees in Tucson to match those in Phoenix.

**3.** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

**4.** Appellee Walker argues that we lack jurisdiction to hear the government's appeal from his judgment of acquittal, because 18 U.S.C. § 3731

states that "no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." There is no double jeopardy problem, however, where a defendant will not be subjected to a second prosecution. As the Supreme Court explained in *United States v. Wilson,* 420 U.S. 332, 344–45, 95 S.Ct. 1013, 1022–23, 43 L.Ed.2d 232 (1975), where "reversal [of a district court's order] on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution." Accord *United States v. Foumai,* 910 F.2d 617, 619 (9th Cir.1990).

**5.** "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. § 45(a)(1). Practices that violate section 1 of the Sherman Act also violate section 5 of the FTC Act. See, e.g., *FTC v. Cement Institute,* 333 U.S. 683, 689–95, 68 S.Ct. 793, 797–801, 92 L.Ed. 1010 (1948).

U.S. 150, 226 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940)).

The government analogizes the dentists here to the lawyers in SCTLA, and argues that the per se rule is thus applicable. Amici supporting the dentists argue that the case should be analyzed instead under the rule of reason. It's true that in a very narrow class of cases, market arrangements involving horizontal restraints are nevertheless analyzed under the rule of reason rather than the per se approach. See *NCAA v. Board of Regents*, 468 U.S. 85, 98–104, 104 S.Ct. 2948, 2958–62, 82 L.Ed.2d 70 (1984) (limiting television coverage of members' college football contests); *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 16–24, 99 S.Ct. 1551, 1560–65, 60 L.Ed.2d 1 (1979) (blanket licensing of copyrighted music at set fees). Such cases, however, involve industries "in which horizontal restraints on competition are essential if the product is to be available at all." *NCAA*, 468 U.S. at 101, 104 S.Ct. at 2960; see also Robert H. Bork, *The Antitrust Paradox* 278 (1978).

The health-care market is not such an industry. As we recently had occasion to note:

> The application of antitrust laws to medical markets dates at least as far back as *American Medical Association v. United States*, 317 U.S. 519, [63 S.Ct. 326, 87 L.Ed. 434] (1943), where the Supreme Court maintained that the "occupation of the individual physicians charged as defendants is immaterial." *Id.* at 528, [63 S.Ct. at 328]. If the Supreme Court's message in *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 349–51 [102 S.Ct. 2466, 2475–77, 73 L.Ed.2d 48] (1982); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 25 n. 42 [104 S.Ct. 1551, 1565 n. 42, 80 L.Ed.2d 2] (1984); and *FTC v. Indiana Fed'n of Dentists*,

·476 U.S. 447, 463 [106 S.Ct. 2009, 2020, 90 L.Ed.2d 445] (1986), was · not clear enough, then its specific announcement in *National Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross*, 452 U.S. 378[, 393, 101 S.Ct. 2415, 2424, 69 L.Ed.2d 89] (1981), should have been.... The antitrust laws apply to hospitals in the same manner that they apply to all other sectors of the economy. *Health care providers are exposed to the same liability and entitled to the same defenses as businesses in other industries.*

*Boulware v. State of Nevada*, 960 F.2d 793, 796–97 (9th Cir.1992) (emphasis added). The district court properly allowed the government to proceed on a per se theory.

## II

A. The jury returned guilty verdicts against all three defendants, who then moved for judgments of acquittal notwithstanding the verdict, and in the alternative for a new trial. The district court granted judgments of acquittal to Meyer and Walker, and granted Alston's new trial motion. The reasons for the court's decision appear to be two: That there was insufficient evidence to support the convictions, and that the instructions given were deficient.[6]

We reject the argument that the jury instructions were erroneous. The district court itself recognized:

> I have looked at my instructions. *I think the instructions are technically and legally correct,* but I think they were too sterile. I didn't relate or connect the instructions to the case itself. And I have been uncomfortable with that ever since, *that while it wasn't a legal error,* that I could have done a better job of telling the jury that they didn't have to find the defendants guilty.

---

**6.** The district judge also noted that this criminal prosecution "bother[ed]" his "sense of fair play" when contrasted with the civil action in *SCTLA*, and expressed concern with the way prosecutors charged defendants in drug cases with mandatory minimum sentences. 1991–1 Trade Cas. at 65,472, 65,476. Absent a showing of discrimination or other unconstitutional misconduct in its charging decisions, such an inquiry into the

prosecutor's motives is improper. *Wade v. United States*, — U.S. ——, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992); *United States v. Redondo-Lemos*, 955 F.2d 1296, 1298–1303 (9th Cir.1992). We interpret the district judge's statements as stray comments given the opportunity to engage the government attorney in a dialogue, rather than grounds for his decision on the merits of the pending motions.

1991–1 Trade Cas. at 65,471 (emphasis added). We have reviewed the instructions and agree that they were "technically and legally correct."

The court began by correctly characterizing a conspiracy as "an agreement of two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means." Instruction # 8. The court went on to state:

> In order to convict any defendant, the government must prove beyond a reasonable doubt as to that defendant each of the following: First, that the conspiracy charged existed at or about the time stated in the indictment; second, that the defendant knowingly—that is, voluntarily and intentionally—became a member of the conspiracy charged in the indictment, knowing of its goal and intending to help accomplish it; third, that interstate commerce was involved.

*Id.* This instruction correctly states the government's burden.[7]

The court also specified the conduct charged in this case: "What the government has charged here, and what it must prove, is that there was a single, continuing conspiracy, which the defendant joined, to fix and raise co-payment fees paid by members of the dental plans named in the indictment." *Id.* This instruction accurately characterizes the indictment and, if proven, would constitute an antitrust violation. See *SCTLA,* 493 U.S. at 422–23, 110 S.Ct. at 774–75.

■ The court then instructed the jury on the per se nature of price fixing:

> Under the Sherman Act, price fixing is per se illegal. If you find there was a conspiracy to fix co-payment fees, it does not matter why the fees were fixed or whether they were too high or low; reasonable or unreasonable; fair or unfair. It is not a defense to price fixing that the defendants may have had good motives, or may have thought that what they were doing was legal, or that the conspiracy may have had some good results.

You may not consider any justification for fixing the fees.

Instruction # 10. Although defendants strenuously object to this instruction on the grounds that it left the jury no choice but to convict, it is an accurate statement of the law. See *SCTLA,* 493 U.S. at 421–24, 432–36, 110 S.Ct. at 774–75, 779–82.

■ Finally, the court noted that "[t]he defendants are competitors if you find that they are individuals providing the same service to customers." Instruction # 12. Again, this instruction is correct under the Supreme Court's most recent price-fixing case. *SCTLA,* 493 U.S. at 422 & n. 9, 110 S.Ct. at 774–75 & n. 9. Each of these jury instructions accurately stated the law of conspiracy and price fixing; they cannot serve as the basis for acquittal. Nor does the district judge's sense he could have made clearer to the jury they didn't have to convict support the judgment of acquittal. A jury is presumed to follow the instructions given by the court. See, e.g., *Yates v. Evatt,* —— U.S. ——, ——, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) ("customary presumption that jurors follow instructions"). We therefore turn to the evidence in the case.

■ B. A judgment of acquittal is improper if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Merriweather,* 777 F.2d 503, 507 (9th Cir.1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986); see *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) ("The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."). In reviewing the district court's decision, we apply the same standard. *Merriweather,* 777 F.2d at 507; *United States v. Hazeem,* 679 F.2d 770, 772 (9th Cir.), cert. denied, 459 U.S. 848, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982); see *United States v. Aceves–Rosales,* 832 F.2d 1155, 1157 (9th Cir.1987), cert. denied, 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988); *United States v. Toomey,* 764 F.2d

---

**7.** Defendants do not claim on appeal that the interstate commerce requirement was not met.

678, 680 (9th Cir.1985), cert. denied, 474 U.S. 1069, 106 S.Ct. 828, 88 L.Ed.2d 799 (1986). Grants of motions for acquittal are reviewed under the same standard as denials. See *United States v. Varkonyi*, 611 F.2d 84, 85 (5th Cir.), cert. denied, 446 U.S. 945, 100 S.Ct. 2173, 64 L.Ed.2d 801 (1980); *United States v. Clemones*, 577 F.2d 1247, 1255 (5th Cir.1978); *United States v. Burnette*, 524 F.2d 29, 30 (5th Cir.1975), cert. denied, 425 U.S. 939, 96 S.Ct. 1673, 48 L.Ed.2d 180 (1976). There is no dispute over these legal standards; the question is their application to the evidence in this case.

■ The government charged, and was required to prove, that defendants agreed to persuade the plans to raise co-payment fees and then took steps to carry out the agreement. The government charged that, in furtherance of this scheme, the defendants met at various offices, including Dr. Alston's, to discuss fees; that they agreed on higher co-payment fees to be paid by the plans; that they agreed to and did mail identical letters to the plans demanding higher fees; and that the plans did in fact raise the fee schedules.

The record here shows that the government made its case. For example, the government introduced Dr. Alston's appointment calendar, which indicated more than one meeting with Dr. Meyers and/or Dr. Walker. Although on appeal, as at trial, defendants offer an alternative explanation for these meetings, the jury must have weighed the evidence and determined that defendants met to discuss fees. We cannot second-guess that determination.

It is undisputed, moreover, that a large number of dentists gathered one evening at Dr. Alston's office to discuss fees, and that all three defendants were instrumental in arranging the meeting. Although defendants advance various explanations for the meeting, the jury was entitled to find that defendants conspired to set the co-payment fees. Defendants had ample opportunity to persuade the jury otherwise; they failed, and this is not the forum to resolve competing factual claims.

The dentists attending the meeting were mailed a form letter to be sent to the plans, together with a cover letter bearing Dr. Alston's name. The cover letter opened: "Enclosed is a copy of the letter we agreed to send." It closed as follows: "I feel it mandatory ... that we get 100 percent participation from all 50 doctors so that we can make a significant impact." The letter to the plans stated, in part, that the sender was "establishing a minimum co-payment schedule," and that it would "be the minimum schedule accepted." Defendants and several other dentists did in fact mail these letters to the plans. Sometime thereafter, the plans raised the co-payment fees to match the schedules in the letters.

The district judge saw the witnesses, reviewed the evidence and was intimately familiar with all aspects of the case. We are reluctant to overturn his informed judgment in this matter. Nevertheless, under the per se rule the jury had only to find that defendants knowingly participated in an agreement to raise co-payment fees. Our review of the record convinces us that it was not irrational for the jury to conclude that defendants did so. Because we must review judgments of acquittal notwithstanding the verdict in the light most favorable to the government, the judgments of acquittal as to Meyer and Walker cannot stand. On remand, the district court shall consider their alternative motions for a new trial.

■ C. A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. See 3 Charles Alan Wright, *Federal Practice and Procedure* § 553 at 245 (1982). "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980); accord *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1979). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside

the verdict, grant a new trial, and submit the issues for determination by another jury." *Lincoln,* 630 F.2d at 1319. Our role is limited to determining whether the district court "clear[ly] and manifest[ly]" abused its discretion. *Id.;* see *United States v. Lopez,* 803 F.2d 969, 977 (9th Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987); *United States v. Shaffer,* 789 F.2d 682, 687 (9th Cir.1986); *United States v. Falsia,* 724 F.2d 1339, 1343 (9th Cir.1983). The decision "is within the sound discretion of the district court, and the appellant carries a significant burden to show" an abuse of discretion. *United States v. Steel,* 759 F.2d 706, 713 (9th Cir.1985) (citation omitted).

■ Appellate deference makes sense. Circuit judges, reading the dry pages of the record, do not experience the tenor of the testimony at trial. The balance of proof is often close and may hinge on personal evaluations of witness demeanor. And, because an order directing a new trial leaves the final decision in the hands of the jury, it does not usurp the jury's function in the way a judgment of acquittal does. In fact, until 1984 *grants* of new trial motions were not appealable. 3 Wright, *supra* p. 10997, § 559 at 95 (Supp.1991). Although they now are, a court of appeals will only rarely reverse a district judge's grant of a defendant's motion for a new trial, and then only in egregious cases.

Here the district judge sat through the entire trial, and after the jury returned its verdicts the judge reviewed all the transcripts. Upon careful reflection, he granted Alston's motion for a new trial. The district judge discussed in detail the dentists' proffered explanations for their behavior:

[I]n essence the testimony is as follows: Dr. Alston says: I talked to Steve Touche [one of the plan managers,] and I have discussed the co-payment schedules, and I think it is undisputed that all of the dentists were complaining they were too low. It wasn't any secret to anybody. They had more expenses because of the AIDS scare and so forth.

I think the companies were well aware that there was unhappiness within the profession with the co-payment schedules.

In any event, Dr. Alston testified and he said that Steve Touche had told him that the Phoenix schedule [the one the dentists wanted adopted] was acceptable and that he should get together with the doctors and make what was called a quote, "show of force," and that as a result of his conversations with Touche he got the doctors together.

I reviewed Steve Touche's testimony. Interestingly enough, he never denies having said that. He just says: I don't recall. That's exactly what he says.

The testimony of the defendants Walker and Meyer and the other people that were at the meeting are [sic] that Dr. Alston had told them and said at the meeting that the companies had approved the schedule—and I am not citing exact words, but, in essence, that he had talked with the companies and the companies were in agreement and that basically what the companies wanted was to see if any dentists would approve of the Phoenix schedule. And, in fact, at the meeting there were discussions about wanting to change some here and there, and Dr. Alston said that he didn't think that they would get approval but that he would go back to the company, or the companies.

I think it is uncontradicted, or certainly the reasonable conclusion of the evidence is that Dr. Meyer and Dr. Walker were told that—or certainly were under the impression that the companies had approved the schedule and that Dr. Alston was kind of the go-between.

*It seems to me that if that is the reasonable conclusion of what the dentists all thought, that there was no conspiracy. They weren't conspiring to do anything, they thought they were working with the company.*

1991–1 Trade Cas. at 65,471–72 (emphasis added).

■ We have reviewed the transcripts of the trial. The dentists offered alterna-

tive explanations for almost everything the government presented. Although the jury apparently chose to believe the government's version of events, a reasonable trier of fact could have come out the other way. Given the district judge's familiarity with the evidence and his ability to evaluate the witnesses, and in light of the deferential standard of review we are bound to apply in reviewing an order granting a new trial, we cannot say the district judge abused his discretion in coming to a different conclusion than did the jury.

The government argues that the district judge's ruling was an abuse of discretion nevertheless, because even under the facts as he viewed them a criminal antitrust violation has been made out. We are confronted, therefore, with a question of law: Assuming that the jury had found the facts as the district court believed it should have, would that have led to a judgment of acquittal? In other words, would a finding that the dentists believed the schedule was proposed or approved by the plans prior to the meeting, and was submitted to the assembled dentists merely for their reaction, absolve them of liability for price fixing?

We recognize that the dental consumers actually bear the burden of higher co-payments, and that the plans' approval of the dentists' action cannot transform an otherwise unlawful conspiracy into a harmless meeting. But in a criminal case the government must prove that the defendants had the requisite mental state to commit the crime. See *United States v. United States Gypsum Co.*, 438 U.S. 422, 436–43, 98 S.Ct. 2864, 2872–77, 57 L.Ed.2d 854 (1978); *United States v. O'Mara*, 963 F.2d 1288, 1292–95 (9th Cir.1992) (Kozinski, J., concurring). The indictment charges, and the district court correctly instructed the jury to find, that the defendants *knowingly conspired* to fix and raise co-payment fees. In a criminal antitrust prosecution, the government need not prove specific intent to produce anticompetitive effects where a per se violation is alleged. See *United States Gypsum Co.*, 438 U.S. at 440, 98 S.Ct. at 2875 (intent requirement has "certain exceptions for conduct regarded as per se illegal"); *United States v.*

*Brown*, 925 F.2d 1182, 1187–88 (9th Cir. 1991). But while they need not have entered the agreement with the specific intent to violate the Sherman Act, mere acquiescence in a fee schedule proposed or approved by the plans does not an antitrust *conspiracy* violation make. *Barry v. Blue Cross*, 805 F.2d 866, 870–74 (9th Cir. 1986) (no Sherman Act violation when Blue Cross sought comments and suggestions from physicians regarding a new health plan; all decisions regarding the plan were made by Blue Cross, not the doctors); see *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 352–53 & n. 26, 102 S.Ct. 2466, 2477 & n. 26, 73 L.Ed.2d 48 (1982). If the dentists had believed they were only complying with the plans' requests, they would have lacked the mens rea necessary for a price-fixing conspiracy.

It is, of course, for the jury to determine whether the dentists' version of this key fact is to be believed, and the first jury apparently did not believe them. The district judge, on the other hand, determined that the evidence weighed heavily against the verdict. We cannot say that the district judge committed a "clear and manifest abuse of discretion," *Lincoln*, 630 F.2d at 1319, in concluding that an injustice could be avoided by presenting the issue to a second jury. "The task of safeguarding the rights of criminal defendants ultimately rests with the experienced men and women who preside in our district courts. We should let them do their jobs." *United States v. Balough*, 820 F.2d 1485, 1491 (9th Cir.1987) (Kozinski, J., concurring).

If the government chooses to retry Alston (and the other defendants if the district court grants their motions for a new trial), the matter that gave the district court pause can be the focus of particular attention. Like the learned district judge, who was troubled by what he termed his "sterile" instructions, we underscore the importance of giving the jury sufficient useful guidance in sorting the evidence before it. For example, while we have approved the district court's Instruction # 10, see p. 1210 *supra*, we note that "price fixing" is a term of art that is hardly self-

defining. Many things that might occur at a meeting such as in Dr. Alston's office would escape the per se rule and might be perfectly legal under the rule of reason: dentists commiserating over the low fee schedules; or impugning the motivations or integrity of the Plans; even sabre-rattling about economic retribution at some indefinite time in the future if their grievances remain unaddressed. Some such activity, like clamoring for governmental protection of their economic interests vis-a-vis their antagonists or competitors, would even be constitutionally protected. See *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). As the Seventh Circuit has observed, the district court must explain clearly what the jury has to find in order to trigger the per se rule: "In such a case, it must be explained to the jury that its function is to decide whether certain conduct, *described with precision in the instruction*, did or did not occur." *Wilk v. American Medical Ass'n*, 719 F.2d 207, 219 (7th Cir.1983) (emphasis added).

 Moreover, while we hold that the situation here is not sufficiently novel or unusual to escape scrutiny under the per se rule, the relationship between individual health care providers and medical plans is not without subtlety and complexity. In a market consisting of individual service providers and individual consumers, concerted action by the suppliers even on matters not directly related to price is viewed with the greatest suspicion. See, e.g., *National Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (holding illegal an engineering association's canon of ethics that prohibited competitive bidding by its members). Needless to say, adoption of suggested or "maximum" fee schedules will run afoul of Section One's per se rule as thinly-veiled attempts at price fixing. See, e.g., *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

But health care providers who must deal with consumers indirectly through plans such as the one in this case face an unusual situation that may legitimate certain collective actions. Medical plans serve, effectively, as the bargaining agents for large groups of consumers; they use the clout of their consumer base to drive down health care service fees. Uniform fee schedules—anathema in a normal, competitive market—are standard operating procedure when medical plans are involved. In light of these departures from a normal competitive market, individual health care providers are entitled to take some joint action (short of price fixing or a group boycott) to level the bargaining imbalance created by the plans and provide meaningful input into the setting of the fee schedules. Thus health care providers might pool cost data in justifying a request for an increased fee schedule. Cf. *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925) (trade association's gathering and disseminating cost and pricing data not per se unreasonable). Providers might also band together to negotiate various other aspects of their relationship with the plans such as payment procedures, the type of documentation they must provide, the method of referring patients and the mechanism for adjusting disputes. Such concerted actions, which would not implicate the per se rule, must be carefully distinguished from efforts to dictate terms by explicit or implicit threats of mass withdrawals from the plans.

Finally, we are told that this is the first criminal antitrust prosecution of health care professionals in half a century. *See* Brief for the ADA and the AMA as Amici Curiae at 4. While it is not our place to question the government's motives in elevating to the criminal level a dispute normally handled as a civil enforcement matter, the crushing consequences of a criminal conviction on the lives and careers of the defendants singled out for such treatment makes it all the more important that the district judge spell out with specificity what the jury must find in order to convict. Although both criminal and civil violations may be made out under the same substan-

tive provisions of the Sherman Act, "the Act has not been interpreted as if it were primarily a criminal statute; it has been construed to have a generality and adaptability comparable to that found ... in constitutional provisions." *United States v. United States Gypsum Co.*, 438 U.S. 422, 439, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978) (internal quotation marks omitted). The district court should therefore be chary of wholesale adoption of jury instructions developed primarily in the civil enforcement context. It may deem it appropriate instead to pattern its instructions around the unique setting of a criminal prosecution. We leave this, like other matters on remand, in the capable hands of the district judge.

### Conclusion

The order granting a new trial as to Alston is AFFIRMED; the orders granting judgments of acquittal notwithstanding the verdicts as to Meyer and Walker are VACATED. The case as to all three defendants is REMANDED for further proceedings consistent with this opinion. If the government elects to retry any of the defendants, the Double Jeopardy Clause does not bar retrial because the first convictions were supported by substantial evidence. *United States v. Scott*, 437 U.S. 82, 90–91, 98 S.Ct. 2187, 2193–94, 57 L.Ed.2d 65 (1978).