**UNITED STATES of America,**
**Plaintiff,**

v.

**Miguel NAVARRO VIAYRA, and**
**Manuel Alvarez Guerra,**
**Defendants.**

**No. CR. S–00–512 FCD.**

United States District Court,
E.D. California.

June 12, 2002.

John K. Vincent, U.S. Atty., Laura L. Swartz, Assist. U.S. Atty., Sacramento, CA, for plaintiff.

C. Emmett Mahle, Sacramento, CA, for Manuel Alvarez Guerra, defendant.

Quin Denvir, Fed. Defender, Caro Marks, Assist. Fed. Defender, Sacramento, CA, for Miguel Navarro Viaya, defendant.

## MEMORANDUM AND ORDER

DAMRELL, District Judge.

Defendants Miguel Navarro Viayra and Manuel Alvarez Guerra move for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure on all counts.[1] The Government argues that these motions should be denied. For the reasons below, the court *sua sponte* converts defendants' Rule 29 motions into motions for new trial, pursuant to Rule 33, and grants both defendants' motions.

### PROCEDURAL BACKGROUND

Defendants were charged with Conspiracy to Manufacture in Excess of 1,000 Marijuana Plants (Count One), 21 U.S.C. §§ 841(a)(1) and 846; Manufacture in Excess of 1,000 Marijuana Plants (Count Two), 21 U.S.C. § 841(a)(1); Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Count Three), 18 U.S.C. § 924(c)(1)(A); and Possession of a Firearm by an Illegal Alien (Counts Four and Five), 18 U.S.C. § 922(g)(5)(A).[2]

Trial by jury began on January 7, 2002. At the close of the Government's case, defendants moved for judgment of acquittal on all counts. Defendants renewed their motions at the close of their case. On January 17, 2002, the jury found defendants guilty on Counts One and Two, and deadlocked on Counts Three, Four, and Five. The defendants renewed their Rule 29 motions after the jury returned its verdict. The Court then requested written briefs and set a briefing schedule and hearing date.

On March 13, 2002, Viayra filed an opening brief to support his Rule 29 motion. On March 28, 2002, the Government filed a response, claiming that this court did not have subject matter jurisdiction because the motion was untimely filed. On April 12, 2002, the court found that it did have subject matter jurisdiction and directed the Government to file a response. Viayra was permitted to file a reply.[3]

### FACTUAL BACKGROUND

On September 20, 2000, a U.S. Forest Service Officer and a Tehama County Sheriff located a concealed "intake" (the water source or "beginning of a pipeline") on a northern fork of Log Springs Creek in the Mendicino National Forest in Northern California. Such intakes are apparently used to water marijuana cultivation sites.

On September 26, 2000, after considerable searching for a marijuana cultivation site, agents found the trailhead (the point

---

1. Unless otherwise noted, all references to a "Rule" or "Rules" refer to the Federal Rules of Criminal Procedure.

2. Viayra was charged with Counts One, Two, Three, and Four while Guerra was charged with Counts One, Two, Three, and Five.

3. Guerra's counsel indicated at the hearing on May 28, 2002 that he joins in Viayra's briefs but has not filed a separate brief.

where the "[marijuana] growers leave the dirt road [and enter the forest]"). The distance between the intake and the trailhead was just a little over a mile. Looking down a hill from the edge of the road, Charles Crackel, law enforcement officer with the U.S. Forest Service and one of the most experienced trackers in the region, observed a very rocky area in which some of the rocks had been turned unnaturally. While hiking down the incline on a foot path, he located a log lying perpendicular to the hillside, and, utilizing his expertise, he concluded that humans had rested against it and stored supplies next to it. The log was about 150 feet from the road. Crackel testified that from the log, or "drop point," one might be able to determine the presence of humans.

On September 27, 2000, during early evening daylight hours, Crackel and nine other law enforcement officers continued down the foot path to find the expected marijuana cultivation site. As they hiked down the foot path in the densely forested wilderness, agents encountered two men, at a distance, coming from the direction of what was later found to be an extensive marijuana cultivation site. The men stopped, stood behind a pine tree, and looked back up the path where the officers were positioned. One of the men drew a handgun from the waistband of his pants and pointed it generally in the uphill direction of the agents who had attempted to conceal themselves. The two men then quickly turned and moved back in the direction of the marijuana cultivation site. Neither of these men was identified as Viayra or Guerra.

A while later, the lead officer encountered two other men, walking toward the group of agents. The officer then ducked down. He saw one of the men head back toward the direction of what was later learned to be the cultivation site. One of the agents believed that one of these men had spotted the agents. The agents decided to wait before proceeding. Neither of these men was identified as Viayra or Guerra.

After waiting for a period of time, at about 11 p.m., the agents came upon a five-acre marijuana cultivation site. After finding the main camp of the site, the agents discovered three persons sleeping on a hillside in the camp. Crackel testified that there were three sleeping bags and *"there could have very well been four."* Agents watched from a distance for twenty to thirty minutes as two of the people slept soundly (Viayra and Guerra), and one restlessly, moving and occasionally looking around. Agents testified that they observed a 30–caliber M–1 carbine rifle lying about one foot away from Viayra, and a SKS rifle lying about ten feet away from the sleeping men closer to Guerra.[4]

After a period of waiting, agents charged the men, yelling "policia!" The "restless" man woke up before the other two. All three men ran. Guerra fell and was taken into custody. Viayra first ran then "ceased his attempt to flee" and went down on his hands and knees. The "restless" man escaped.

After arresting Viayra and Guerra, agents removed the guns for safety purposes. About 15 hours later, they replaced the guns where they had originally been observed in order to photograph them. Neither of the firearms was submitted for fingerprint testing. Agents located ammunition for the firearms in the sleeping area and handgun ammunition in

---

4. The record is not clear as to how many guns were found at the cultivation site. However, it is clear that at least these two guns and an air rifle were recovered and there was no evidence of defendants' fingerprints on any weapon.

a different area. The ammunition was submitted for fingerprint testing. Neither defendant's fingerprints were found. Agents also found a pronged hand cultivation tool, a pile of discarded marijuana stems, a cassette player, and a Spanish magazine near the arrest site.

The cultivation site was in the Mendocino National Forest, about 40 miles east of the town of Corning. Corning, located on I–5, is the town closest to the site. Halfway between the cultivation site and Corning lies a very small community named Paskenta. The road from Corning to Paskenta is a two-lane paved road. There was little evidence describing Paskenta other than it is without traffic lights and has "one or two stores" and a "pay phone." The road from Paskenta in the direction of the trailhead featured a "substantial climb in elevation" and is paved to within approximately five miles of the trailhead. There are no houses or stores on this road. One witness estimated it would take a person "eight to ten hours to run" from the camp to Paskenta. A witness *surmised* that, at night from a ridge "near" the cultivation site, one could see the lights from Paskenta, 20 miles away, or Corning, 40 miles away. However, there was no evidence as to the elevation of the ridge, its exact location, or if defendants had ever climbed it.

The campsite was not fenced. While the testimony describing the site was somewhat limited, the video of the site, taken immediately after the arrest of the defendants, showed a heavily forested, rugged terrain thick with vegetation. Government witnesses testified that a camp of this size would probably feature an organizational hierarchy, with a spectrum of authority ranging from decision makers to guards to manual laborers. Government witnesses believed the camp would have contained upwards to twenty people. Fourteen sleeping bags were left, scattered throughout the entire camp.

The cultivation site contained about 1,890 marijuana plants and had eight growing sites. The camp, itself, had a kitchen area with a propane-fueled stove, a garbage area, three marijuana processing areas, and two sleeping areas, one where the defendants were found and a larger one closer to the kitchen and covered with a canopy. The kitchen area contained 49 cans of beans, 168 cans of tuna fish, and sacks of potatoes, onions, and tortillas. There were no visible restrictions to food access. An air rifle was found near the canopied-covered sleeping area. Two kinds of handgun ammunition were found but agents did not find matching guns. Piles of stripped marijuana stems were scattered around the site. Officers found no cars, cell phones, or electricity anywhere at the site.

## 1. Testimony of Viayra

Viayra testified that he had illegally entered the United States, and on September 17, 2000, while in Fresno, California, he was approached by a stranger of Mexican descent and offered a job doing "construction" in Sacramento. On September 18, 2000, he was picked up in a red van to go to the job site. The van had no seats so he had to sit on the floor. Viayra testified that the van traveled at night and that there were no windows for him to look through. After a "long journey" the van stopped. It was still night when Viayra got out and was confronted by four or five men who instructed him to follow them. The men were carrying long guns, pointing at Viayra. He had never seen the men before and felt frightened. He followed the men but kept falling and stumbling as he walked downhill. The long walk ended as dawn broke. The men told Viayra that this was where he was going to work, and

that he should not try to leave because he would be killed. Viayra saw about 20 people all working in the area, most of whom were young Mexican men.

Four or five armed men led Viayra to the area where he would work. They kept their guns pointed at him. On September 19, 2000, Viayra was put to work stripping leaves off marijuana plants. The armed men told Viayra that if he tried to leave, he would be killed. The armed men did not let any of the workers talk to one another. If the armed men heard the workers talking, they yelled "shut up" or "keep on working." Viayra testified that he was very afraid.

From September 19 until the day he was arrested, Viayra was awakened early by the armed men (the "guards") and put to work all day. Viayra and the other workers were given three meals a day but were not free to eat when they wanted.

Viayra and the other workers were monitored by the armed men the entire time he was working. The armed men always held their guns in their hands, not slung over their backs. Viayra was also guarded by the men when he was sleeping. Viayra never spoke to the guards nor did he attempt to run away because he was afraid he would be killed. There was no fence surrounding the site nor was Viayra bound by physical restraints. Also, Viayra was left alone when he went into the woods to relieve himself.

According to Viayra, from time to time, the "leader" would enter the camp and give orders to the guards with guns. The "leader" kept a gun in the waistband of his pants.

The day before his arrest, Viayra was taken by an armed guard to a different location within the camp, at which he was

forced to work until about 6 p.m. Guards brought Guerra to the same location to work. At around 6 p.m., Viayra and Guerra were moved by two armed guards through the kitchen area of the camp to another processing area, where they were made to trim marijuana leaves. Viayra testified that, at this time, he noticed the camp was empty of people.

After trimming leaves for a short time, Viayra and Guerra were taken to a sleeping area. They lay down next to one another, flanked by the two armed guards who were holding their guns. Viayra was awakened by the sensation of something "falling on top of him." Viayra was frightened and his "first reaction" was to run. Viayra stated that he did not see a gun on the ground. Viayra ran a short distance and sank to his knees when he heard the officers yell "policia."

Viayra testified that he never touched any of the guns found at the site. Viayra stated that on the night of the arrest, after he fell asleep, he never saw either of the guards again. He testified that during his time at the site, he saw more than six guns and never touched any of them. Viayra stated that if the men had not had guns with them, he would have tried to leave the site.

Viayra testified that he had been in Fresno and Madera, California and Milwaukee, Wisconsin. He has twice "passed through" Calexico, California. Viayra stated that he does "not know about firearms" and that he dropped out of school when his mother died when he was eight or nine years old.

### 2. Testimony of Guerra

Guerra was 20 years old at the time of the offense,[5] and had gone no further than

---

**5.** While no evidence was introduced establish- ing Viayra's age, he appeared to be the same

the third grade in Mexico. Guerra stated that he had been to the United States one time previous to this incident when he was 17 years old working with his father picking peaches in Merced, California. Guerra testified that while in Mexico he was approached by a man named "Jesus" who offered him a job cutting wood in California. Guerra said that Jesus advised him that Guerra would be picked up in Tijuana and taken to Mexicali where he would cross the border on foot with another person, referred to as a "coyote." Guerra stated that after walking for three days he illegally crossed the border and was picked up by a white van. It was dark outside when Guerra got into the van. Guerra testified that he carried one U.S. dollar and Mexican currency worth 20 pesos in his wallet. Guerra testified that he followed instructions to lie down in the van while he was driven. After two or three days, when the van reached its destination it was nighttime. When Guerra got out of the van, he was met by a man with a gun. The man told Guerra to start walking downhill and Guerra walked for about an hour. Guerra was then told to watch the "water source." Guerra stayed at the water hose for seven days. Then two men with guns led him to another site 30 minutes away. Guerra testified that the men told him that they were going to kill him if he ran away. Guerra was given the task of cooking. Guerra was then taken to a place to cut leaves and saw Viayra for the first time. Both defendants testified that they did not know each other nor did they know where they were.

### STANDARD

In this case, the affirmative defense of duress was raised and the Government stipulated that it had the burden to prove the absence of duress beyond a reasonable

age as Guerra.

doubt. Therefore, the Government not only had the burden of proving the elements of the offenses charged but also the burden of proving the *absence* of duress beyond a reasonable doubt.

The elements of duress are as follows:

1. There was an immediate threat of death or serious bodily injury to the defendant if he did not participate in the commission of the crime;

2. The defendant had a well-grounded fear that the threat of death or serious bodily injury would be carried out; and

3. The defendant had no reasonable opportunity to escape the threatened harm.

Ninth Circuit Criminal Model Jury Instructions 6.5 (2000). Because a showing of duress requires all three components, the Government could meet its burden by showing beyond a reasonable doubt that any one of the three elements was not met.

Counsel for defendants have chosen to file only Rule 29 motions for judgment of acquittal. Counsel also could have moved for new trial under Rule 33, as an alternative, at the same time they filed their Rule 29 motions. *See United States v. Rojas*, 554 F.2d 938, 944 (9th Cir.1977). Under a Rule 29 motion, the evidence must be viewed in the light most favorable to the government. There is sufficient evidence to support a conviction if any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. *United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000).

However, a district court's power to grant a Rule 33 motion for new trial is

"much broader" than its power to grant a motion for judgment of acquittal... *United States. v. Kellington,* 217 F.3d 1084, 1097 (9th Cir.2000). "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Alston,* 974 F.2d 1206, 1211 (9th Cir.1992) (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980)). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Alston,* 974 F.2d at 1211–1212 (quoting *Lincoln,* 630 F.2d at 1319). Rule 33 specifically states that "... the court may grant a new trial ... *if the interests of justice so require.*" Fed.R.Crim.P. 33 (emphasis added).

█ The Rules do not explicitly address whether a district court has the power to *sua sponte* convert a Rule 29 motion into a Rule 33 motion. There is no Ninth Circuit authority directly on point.[6]

However, in *United States v. Taylor,* 176 F.3d 331 (6th Cir.1999), the defendant moved for judgment of acquittal but the district court instead granted him a new trial. In approving the district court's approach, the Sixth Circuit stated, "The language of [Rule 33] precludes the *filing* of a *motion* for a new trial after seven days, but does not address the district court's authority to deny a timely motion for acquittal, while nonetheless concluding that the arguments underlying the motion justify a new trial ... the Federal Rules of Criminal Procedure do not preclude the district court's approach." *Id.* at 335 (emphasis in original).

Since the Rules do not preclude a district court from *sua sponte* converting a Rule 29 motion into a Rule 33 motion, the court finds the following standard to be proper: (1) if the defendant timely files a Rule 29 motion and if under the Rule 29 standard, which views the evidence in the light most favorable to the Government, the court finds there are insufficient grounds to grant a Rule 29 motion; yet (2) to allow the verdict to stand would result in a serious miscarriage of justice; then (3) the court may review the evidence, *sua sponte,* under the Rule 33 standard; and (4) if the court finds that "the evidence preponderates sufficiently heavily against the verdict," *Alston, supra,* 974 F.2d at 1211; then (5) the court may *sua sponte* convert the *timely* filed Rule 29 motion into a Rule 33 motion to avoid a miscarriage of justice. *Taylor, supra.*

**6.** In *United States v. Rojas,* 574 F.2d 476 (9th Cir.1978), the Ninth Circuit stated, "In all cases where the verdict or finding of guilty occurs after June 1, 1978, defendant will be required to have made a timely motion in the district court for a new trial under Rule 33 to preserve that possibility should the granted motion of acquittal under Rule 29(c) be reversed on appeal." Read broadly, this language could mean that defendants must file a Rule 33 motion before a court can grant a Rule 33 motion. However, a fair reading of the opinion discloses that the Ninth Circuit

was only opining as to a *defendant's filing* requirements, rather than to the power of a district court to *sua sponte* convert a Rule 29 motion into a Rule 33 motion.

In addition, there is a Ninth Circuit case which observes, without disapproval, that a district court *sua sponte* converted a Rule 29 motion into a Rule 33 motion. *See United States v. Jimenez Recio,* 258 F.3d 1069, 1077 (9th Cir.2001) (Gould, J., dissenting), *reh'g and reh'g denied,* 270 F.3d 845 (2001), *cert. granted,* —— U.S. ——, 122 S.Ct. 2288, —— L.Ed.2d —— (2002).

## ANALYSIS[7]

Count One charged the defendants with "knowingly and intentionally" conspiring with each other and persons unknown to manufacture marijuana plants. Count Two charged the defendants with "knowingly and intentionally" manufacturing 1,000 or more marijuana plants. However, the court instructed the jury that the defendant does not act knowingly or intentionally if he acted under duress at the time of the offenses charged.

### 1. Duress: Elements One and Two (Imminent Threat and Well–Grounded Fear)

 The Government argues that it met its burden of proving the absence of duress beyond a reasonable doubt. As to the first two elements, the Government argues that the jury could have chosen to disbelieve the defendants' accounts. As to the first element, the Government argues that there is sufficient evidence to rebut defendants' testimony, such as the firearms observed near the defendants. The Government argues that guns would not have been left near the defendants if they had been guarded and, therefore, it is reasonable to infer that neither defendant was under armed guard. Regarding the second element, the Government argues that sufficient evidence demonstrated that the defendants did not have a reasonable fear because they were "well cared for,"[8] had "toiletries," and were "well fed." The Government further argues that such evidence proves that defendants, not only were not hostages, but were, in fact, willing participants in the conspiracy. Indeed, the Government presents the defendants as two men who saw the opportunity to manufacture marijuana for money and took it.

While the above evidence supports the absence of duress, nevertheless, the court finds that there is considerable evidence, and reasonable inferences derived from the evidence, consistent with the defendants' accounts that they were guarded by armed men who threatened to kill them if they tried to escape.[9] This evidence includes the following: (1) prior to arriving at the camp, agents had two separate encounters each with two men (not the defendants) including a man pointing a handgun; (2) one of the agents testified that he believed that one of the men in the second encounter had spotted the agents; (3) when agents arrived at the campsite, they observed that, unlike the defendants who slept soundly, the third man was "restless" and "looked around"; (4) Crackel's testimony that instead of three sleeping bags where the defendants were sleeping *"there could have very well been four"*; (5) when

---

**7.** While there are factual differences between Viayra's and Guerra's situations, specifically regarding how each came to the cultivation site, for purposes of their motions, the legal analysis for the two is the same. Therefore, Viayra and Guerra are not discussed separately.

**8.** The video which was taken after defendants' arrest depicts defendants in a disheveled state, handcuffed to trees and belies the Government's argument that they were "well cared for."

**9.** The Government argued, by clear implication, that defendants' testimony claiming duress reflected a recent fabrication. This argument is rebutted by defendants' post-arrest statements given after they had been advised of their rights by agents. However, neither Viayra's nor Guerra's statement was offered into evidence. In their separate post-arrest statements, Viayra and Guerra claimed that they had been taken to the site and forced to work under threat of death by armed guards. These statements were both exculpatory and corroborative of defendants' testimony at trial. Nevertheless, the statements are not evidence and the court does not rely upon them in rendering its decision.

agents inspected the campsite that night, they found that only the defendants and the "restless" man remained; (6) defendants testified that the "restless" man and a second man were guarding defendants before they fell asleep; and (7) various firearms and ammunition were found at the campsite, yet, neither defendant's fingerprints were found on the firearms or ammunition. Importantly, the defendants' testimony, coupled with Crackel's testimony, provides a credible explanation why two weapons and ammunition, with no evidence of defendants' fingerprints on either, were found on either side of defendants as they slept, namely, that the weapons belonged to the two men who had been guarding them.

In addition, the following evidence about the camp, its location, operation, and organization also must be considered in order to assess the defendants' credibility: (1) the camp was located in a remote area of a national forest in order to prevent detection; (2) the camp was an extensive and sophisticated operation; (3) the camp was divided into different areas according to function; [10] (4) up to 20 people may have resided in the camp; (5) a Government witness opined that an organizational hierarchy was in place (a chief, guards, and workers); and (6) the site covered about four to six acres with nearly 2,000 plants which could have been processed into about 500 to 600 pounds of marijuana, worth at least $1.5 million.

Given this level of organizational sophistication and the value and location of the criminal enterprise, the court finds it reasonable to infer that if defendants had been active members of this conspiracy,

they likely would have been notified that law enforcement officers were advancing towards the camp. Indeed, it would seem logical that all co-conspirators would have been alerted of such an impending threat to their criminal enterprise. In fact, since all other occupants of the camp had left by the time the agents arrived, it appears that they had been given notice. Yet, the defendants apparently were given no such notice as they were found *sleeping soundly*. The logical inference is that they were expendable likely due to their ignorance of the operation and the operators.

Thus, considering the circumstantial evidence, the lack of direct evidence connecting these defendants to the weapons and ammunition, and circumstances of these two young, virtually penniless,[11] likely illiterate, and illegal Mexican aliens who were found abandoned in a remote camp in the wilderness with apparently no idea where they were, the court concludes that the totality of the evidence *corroborates* the defendants' testimony that they faced an imminent threat and had a well-grounded fear. In short, the Government simply did not disprove the first two elements of duress beyond a reasonable doubt.

### 2. Duress: Element Three (Reasonable Opportunity to Escape)

 The Government argues that the following evidence proved the third element of duress beyond a reasonable doubt: (1) testimony from an agent that the small community of Paskenta and a pay phone was 20 miles away; (2) the national forest terrain was walkable without special gear; (3) Viayra testified that he was alone when

10. These functional areas included three sleeping areas (which contained at least fourteen sleeping bags), a kitchen area, a garbage area, eight separate cultivation gardens, and a variety of processing sites throughout the camp.

11. At the time of their arrest, Guerra was found with one U.S. dollar and Mexican currency worth 20 pesos, while Viayra had no money.

he relieved himself so he was not guarded twenty-four hours a day; (4) defendants could escape since the camp was not fenced; (5) testimony that a person in the thickly-forested area could "disappear" from sight in 30 feet; (6) the "restless" man successfully fled arrest so defendants should have been able to flee the camp; (7) Viayra had spent time in Milwaukee, Wisconsin and had significant contacts in Milwaukee; and (8) defendants exhibited behavior that was not consistent with being a hostage (i.e. according to their testimony, when they arrived at camp, they did not question why the work was not what they expected and they slept soundly).

The Ninth Circuit has stated that "the opportunity to escape must be *reasonable*." *United States v. Contento–Pachon*, 723 F.2d 691, 694 (9th Cir.1984) (emphasis added). In *Contento–Pachon*, defendant was a native of Bogota, Columbia who claimed that he was forced to swallow cocaine-filled balloons and transport them to the United States by a man who claimed that he would kill the defendant's family if he did not cooperate. The Ninth Circuit found that the defendant was entitled to assert a duress defense because he had presented, *inter alia*, a triable issue on the element of escapability. The court stated, "To flee, Contento–Pachon, along with his wife and three-year-old child, would have been forced to pack his possessions, leave his job, and travel to a place beyond the reaches of drug traffickers. A juror might find that this was not a reasonable avenue of escape." *Id.* Therefore, the question, here, is, in light of the evidence, whether a "reasonable avenue of escape" was available to the defendants?

There is evidence that defendants apparently had opportunities to leave the camp. By their own testimony, defendants were left alone to relieve themselves and, according to the Government, could have left the camp at such times. Conceivably, after escape from the camp, Viayra and Guerra could have found the foot path (which led to the camp from the trailhead) and then gone on to Paskenta 20 miles away or Corning 40 miles away.

In fact, it is hardly clear from the evidence that defendants had sufficient understanding of their location that they could find their way to Paskenta or any other place. Indeed, there is no evidence that the defendants knew Paskenta or Corning existed. According to defendants, they had been taken at night to a remote location within a wilderness area. Viayra testified that there was no way he could have known where he was since he had been transported by van at night and there were no windows through which he could determine his location as the van traveled. Similarly, Guerra also had no way to gauge his location since he also traveled only at night. Indeed, it seems reasonable that transporters of illegal aliens would very likely conduct business at night and would take every precaution to avoid disclosure of the location of the marijuana cultivation site to anyone, including illegal aliens. Importantly, no evidence was introduced showing that defendants had been to this part of California.[12] Moreover, it would seem highly improbable to infer from the evidence that these two young, illegal, and likely illiterate Mexican nationals would have previously ventured into the wilds of the Mendicino National Forest. It would be far more

---

**12.** According to defendants' testimony, the furthest north in California that defendants had been was Fresno for Viayra and Merced for Guerra. Unfortunately, no evidence was

offered to establish the distance between Fresno or Merced and the Mendicino National Forest.

reasonable to conclude from the evidence that the defendants had no idea where they were or where to go for help.

 Importantly, even if defendants could have left the camp undetected, where could they have gone? They were in the middle of Mendicino National Forest. Is it reasonable to have expected that the defendants could leave the camp, where they had food, sleeping bags, and a degree of protection and venture into the unknown wilderness? Surely, a *reasonable* opportunity to escape cannot mean that these defendants are *required* to flee into the unknown dangers of a vast forest in a foreign land. *See United States v. Michelson,* 559 F.2d 567, 570 (9th Cir. 1977) ("... [a prison] escape will not be excused by reason of duress if the escapee fails to submit to proper authorities immediately after attaining a position of *safety.*") (emphasis added).

Finally, the Government assumes that both defendants could have left the camp apparently without risk of serious harm. This appears to be a wholly unrealistic assessment. The camp was heavily guarded and located in such a way as to prevent detection. The reasonable inference from these facts is that the armed members of the conspiracy were concerned about people coming to *or* leaving the camp, and would have used force, even deadly force, to prevent anyone placing the million-dollar-plus marijuana harvest at risk. Therefore, even if the defendants had left the camp and somehow found the road to Paskenta, they still ran the serious, if not obvious, risk of pursuit, capture, and possible death or serious bodily injury by those familiar with the terrain and location of the camp. The court believes the above inferences are not speculative but rather very realistic in light of this high-value, remote, and dangerous enterprise. These are hardly circumstances that prove a rea-

sonable opportunity for escape beyond a reasonable doubt. In fact, the evidence demonstrates just the opposite.

## CONCLUSION

 If the court were to apply the Rule 29 standard and view the evidence in the light most favorable to the Government, the defendants' motions would not be granted. The court, however, finds that denial of defendants' *timely* motions for judgment of acquittal under Rule 29 would result in a substantial miscarriage of justice. The court finds that "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred" and, therefore, "set[s] aside the verdict, grant[s] a new trial, and submit[s] the issues for determination by another jury." *Alston, supra,* 974 F.2d at 1211–1212. Therefore, the court *sua sponte* CONVERTS defendants' Rule 29 motions into Rule 33 motions and GRANTS both motions.

IT IS SO ORDERED.