UNITED STATES of America, Appellee,

v.

Quentin Ira LINCOLN, Appellant.

No. 80–1160.

United States Court of Appeals,
Eighth Circuit.

Submitted June 9, 1980.

Decided Oct. 14, 1980.

James R. Britton, U. S. Atty., Fargo, N. D., for appellee.

Alan J. Larivee, Murray, Olson, Larivee & Bohlman, Grand Forks, N. D., for appellant.

Before ROSS, Circuit Judge, GIBSON, Senior Circuit Judge, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

On November 27, 1979, appellant Quentin Ira Lincoln, an Indian, was charged by

---

* The Honorable William C. Hanson, Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

grand jury indictment with the murder of Julie Robertson within the boundaries of the Devils Lake Sioux Indian Reservation in violation of 18 U.S.C. §§ 1153 and 1111. Trial was to a jury, which returned a verdict of guilty of the lesser included offense of voluntary manslaughter. Judgment of conviction was entered on the verdict; Lincoln was sentenced to six years imprisonment. This appeal raises issues concerning the sufficiency of the indictment, the sufficiency and weight of the evidence, the district court's instructions to the jury, and certain remarks made by the government's attorney during closing argument. We affirm.

## 1. The Indictment.

18 U.S.C. § 1111(a) defines murder as follows:

> (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

> Any other murder is murder in the second degree.

The indictment read as follows:

> Charge: Violation of Title 18, U.S.C., Sections 1111 and 1153

THE GRAND JURY CHARGES:

> On or about the 14th day of August, 1979, near Fort Totten, North Dakota, in the District of North Dakota, within the exterior boundaries of the Devils Lake Sioux Indian Reservation, in Indian country, and within the exclusive jurisdiction of the United States, QUENTIN IRA LINCOLN, an Indian, with malice aforethought, murdered Julie Robertson by beating her.

Prior to trial there was evidently confusion in some minds as to whether the indictment charged Lincoln with murder in the first or second degree. The post–indictment arrest warrant stated that he was to be arrested for first degree murder. The papers appointing defense counsel for Lincoln also indicated that the charge was first degree murder. On the afternoon of the first day of trial, after the jury had been selected but before opening statements were made, counsel for Lincoln moved that the indictment be dismissed "based upon the fact that the indictment does not state an essential element of the crime charged. Nowhere in the indictment does it indicate at all anything about premeditation which would be necessary for a charge of first degree murder. The indictment specifically talks about malice aforethought only . . . ." Counsel further stated that "[i]t is my understanding that the highest charge that can be brought at this time is second degree murder." After some discussion the district court indicated that it would reserve ruling on the motion until the next morning, to which defense counsel replied, "That's fine, thank you." The government proceeded with its opening statement and presentation of evidence; defense counsel reserved his opening statement until the close of the government's evidence. The next morning, before the government proceeded with its case, the district court ruled as follows:

> It is fundamental that one of the purposes of the indictment is to inform the Defendant of the charge which has been brought against him. In this case the Defendant has only been charged with murder, under the definition of murder. Obviously, therefore, he has not been given notice that he has been charged with first degree murder, so the jury will be instructed that the charge in this case is murder in the second degree.

The trial proceeded on that basis without further objection, and the jury was so instructed.

■ On appeal, Lincoln argues that the district court erred in not dismissing the

action because the indictment failed to charge first degree murder. The gist of the argument is that the government intended to charge first degree murder; that the indictment was insufficient for this purpose (as the district court ruled); that the indictment was fatally ambiguous as to whether first or second degree murder was charged; that in holding that only second degree murder was charged the district court improperly amended the indictment; and that in any case Lincoln was prejudiced by the fact that the district court did not rule on the motion to dismiss until the second day of trial. We find no merit in these contentions.

The indictment was clearly sufficient to charge the crime of murder as defined in 18 U.S.C. § 1111(a); Lincoln does not claim otherwise. Moreover, we find no ambiguity as to whether first or second degree murder was charged. Had the grand jury wished to charge murder in the first degree, it would have been required to include in the indictment one or more of the special elements, as set forth in § 1111(a), peculiar to the more serious charge. Conversely, however, it was not necessary, in order to charge second degree murder only, to explicitly negate the additional elements of murder in the first degree. By omitting any mention of those additional elements the grand jury clearly and unambiguously charged murder in the second degree only: "Any other murder is murder in the second degree." Defense counsel indicated his understanding of this point during the discussion of his motion to dismiss. It would have been reversible error for the district court to hold otherwise. *Ornelas v. United States*, 236 F.2d 392 (9th Cir. 1956). The contention that the court amended the indictment by so holding is frivolous. What the government may have intended the charge to be is of no moment. There is no evidence that the *grand jury* intended to charge first rather than second degree murder; but its charging intention, as manifested in the indictment, controls. Finally, Lincoln has shown no prejudice whatever

due to the half–day delay–to which his attorney consented–in the ruling on his motion to dismiss. He points to nothing he would have done differently if the ruling had been made earlier. The bare allegation of prejudice, without more, will not suffice.

II. *Sufficiency and Weight of the Evidence.*

After the jury returned its verdict, but before entry of judgment, Lincoln filed a motion for new trial. One ground for the motion was that the district court had erroneously denied his motion for judgment of acquittal made at the close of the government's evidence. The district court correctly treated this contention as a timely post–verdict motion for judgment of acquittal under Rule 29(c), F.R.Crim.P. Another ground for the motion for new trial was that the verdict was contrary to the weight of the evidence. The district court denied the motion for judgment of acquittal, and held that the verdict was not contrary to the weight of the evidence. We review these rulings separately.

A. *Sufficiency.*

■ A post–verdict motion for judgment of acquittal puts in issue the sufficiency of the evidence to sustain the verdict. It is in this respect precisely like an appeal from a judgment of conviction on the ground that the evidence was not sufficient to sustain the verdict on which the judgment was entered. The court reviewing the sufficiency of the evidence, whether it be the trial or appellate court, must apply familiar principles. It is required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably to be drawn in its favor from the evidence. The verdict may be based in whole or in part on circumstantial evidence. The evidence need not exclude every reasonable hypothesis except that of guilt; it is sufficient if there is substantial evidence justifying an inference of guilt as found irrespective of any coun-

tervailing testimony that may have been introduced. If so, the issue of guilt or innocence has been properly submitted to the jury for its determination, and the motion for judgment of acquittal is properly denied. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Knife*, 592 F.2d 472, 475 (8th Cir. 1979); *United States v. Robinson*, 71 F.Supp. 9, 10 (D.D.C.1947). We next review the evidence presented at the trial of this case with these principles in mind.

■ Robertson was a young woman of Native American ancestry whose immediate family lived in Chicago. She went to visit her grandmother, Mrs. Grace Lambert, in Fort Totten, North Dakota, on the Devils Lake or Fort Totten Indian Reservation, in August 1977. She found a job nearby and stayed on. She met Lincoln, a young man recently out of the Army, at the place where they were both employed. They began dating. Robertson, however, left the Dakotas to go first to Chicago for the summer of 1978 and then to college in Lawrence, Kansas that fall.

Robertson left college sometime in 1979 to go and live with Lincoln. They lived in or near Fort Yates, North Dakota, on the Standing Rock Indian Reservation. There is evidence that they lived less than settled lives. They evidently drank a good deal, and fought, sometimes with each other; he beat her up several times. At length Robertson ran away from Lincoln, returning on August 2, 1979 to live with her grandmother at Fort Totten. Lincoln followed her, wishing her to come back with him. She was ambivalent. Between August 2 and August 14, they saw a good deal of each other. Robertson's grandmother, Mrs. Lambert, disapproved of the relationship; she thought that Lincoln was a bad influence on Robertson, and she was afraid Robertson would return to live with him.

Lincoln picked up Robertson at Mrs. Lambert's house on the morning of August 13. They spent the day, in the company of others, drinking. Robertson was in the process of making up her mind what she would do; her mother was coming soon to Fort Totten, and a decision would have to be made as to whether Robertson would return with her to Chicago. Perhaps Robertson and Lincoln quarrelled; at any rate, he threw her into a lake. She left the party and ultimately returned to Mrs. Lambert's at around 9:30 p. m. She told her grandmother that she had made up her mind that she was going to return to Chicago with her mother and then go back to school in the fall. This plan had evidently been communicated to Lincoln. Robertson went to bed at around 10 p. m.

At about the same time, Lincoln and his mother appeared at the home of Hattie Peltier in Fort Totten. Lincoln's sister, Linda, was married to Hattie Peltier's son Joe. Linda and Joe Peltier were staying at Hattie's home. Lincoln and his mother visited with Linda and Joe until around midnight, when Lincoln and Joe left to get gas and buy beer. They returned, and left again at around 2 a. m., this time taking Lincoln's mother and Linda with them. They were riding in Lincoln's car, which was without a muffler and so ran very loudly. They were drinking in the car. The jury could infer that Lincoln had consumed large quantities of beer and some whiskey that day, evening, and night. There was evidence that he had on occasion become violent after drinking.

Sometime between 3 and 4 in the morning of August 14 the car carrying Lincoln, his mother, and Linda and Joe Peltier pulled into the yard of Mrs. Lambert's home. Lincoln yelled from the car for Robertson. Her uncle, Mark Lambert, got up, went to the door and told Lincoln to "get the hell out of here." The car left. It returned about a half hour later, however, and parked on the road below the house, with the motor running. Linda Peltier came up to the house and knocked. Robertson, Mark Lambert, and soon Mrs. Lambert, all went to the door. Linda Peltier told

Robertson to come down to the car and get some of her clothing, saying that Lincoln was leaving for Fort Yates the next day, and reassuring Robertson that "you don't have to worry. There is just me and Joe in the car." After some discussion, Robertson got dressed and walked down to the car with Linda, against the wishes of Mrs. Lambert. As she left, she said, "Grandma, don't worry. I won't go with them."

When Robertson and Linda Peltier got to the car, Lincoln got out of it and Linda got in. Lincoln and Robertson went behind the car to get the clothes; at some point Joe Peltier handed Lincoln a screwdriver to use to open the trunk, whose lock was broken. Lincoln and Robertson were behind the car for from five to ten minutes. No one who testified at trial[1] saw or heard distinctly what happened during that time. Those in the house apparently could not see or simply did not look; those in the car could not see because the trunk lid was raised, and could not hear well because the radio was on and the car was idling loudly. It may be inferred that Lincoln and Robertson quarrelled. Lincoln admitted the next day that he at least slapped her; and Joe Peltier at length called back to say "Let's go, Quentin, it is enough," or words to that effect. At length the trunk was closed, Lincoln got into the car and said "Let's go," and the car drove away fast.

A few minutes later, when Robertson did not return to the house, her grandmother looked down to the road. She saw a dark object laying there. Worried, she sent Mark Lambert down to find out what it was. It proved to be Robertson, lying unconscious. Mark Lambert ran back to the house; he was getting a blanket to take to Robertson when he and Mrs. Lambert heard the same loud car returning. Mark went to get his gun; however, before any shots were fired, the car, which stopped briefly near Robertson, left quickly. The clothes Robertson had gone to get were not found.

Robertson never regained consciousness. She died about two months later of respira-tory complications resulting from injuries to her brain suffered on August 14. The medical personnel who examined her immediately after she was found testified that besides her head injuries and some bruises on her right hand and near her left breast, she suffered no broken bones, cuts, or lacerations; nor was her clothing torn. It is unlikely that her injuries were caused by being hit by a car. Her head injuries were most likely caused by being hit by or falling against some blunt object.

At about 6 o'clock in the morning of August 14, Joe Chaske, chief judge of the tribal court in Fort Totten, was awakened by a phone call. A woman's voice, which he identified as Linda Peltier's, informed him that "Quentin [Lincoln] has finally killed Julie [Robertson]." When Lincoln learned during that day that he was wanted in connection with the injury to Robertson, he at first hid in the woods, but later turned himself in. On August 24, he wrote Robertson a letter from jail, saying (among other things), "Now I know what booze can do to a person and I plan to quit because all it does is get me into trouble, and makes me hurt the one I love," and asking Robertson to forgive him.

We hold that the evidence just reviewed is more than sufficient to sustain the jury's verdict that Lincoln was guilty of voluntary manslaughter. We recognize that there were some conflicts in the testimony, particularly about the relations between Lincoln and Robertson and the details of the events of August 13–14. However, the defense introduced no evidence directly contradicting the verdict; at best the countervailing evidence raised the speculative possibility that Robertson's fatal injuries were caused, not by Lincoln, but by a second car that allegedly passed by just as Lincoln and the others were pulling away after the confrontation between Robertson and Lincoln. The jury was entitled to resolve the conflicts in the evidence against the defendant. Having done so, it could reasonably con-

---

1. Lincoln did not testify.

clude that Robertson intended to end her stormy relationship with Lincoln and go back to school; that Lincoln knew this and was not happy about it; that they quarrelled behind the car; and that Lincoln struck Robertson, knocked her to the ground, and left her there with the serious head injuries that ultimately resulted in her death. The district court did not err in denying Lincoln's post–verdict motion for judgment of acquittal. The case was properly for the jury for its determination of the question of guilt or innocence.

### B. *Weight.*

■ When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury. This authority should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice. Corresponding to the district court's broad discretion is the limited scope of our review: we will reverse the district court's ruling on the motion for new trial only if we find that ruling to be a clear and manifest abuse of discretion. *See United States v. Bohn*, 508 F.2d 1145, 1150 (8th Cir. 1975); *United States v. Robinson*, *supra*, 71 F.Supp. at 10–11; 2 Wright, Federal Practice and Procedure: Criminal, § 553 at 486–87.

■ We have reviewed the entire record. We cannot say that the district court abused its discretion in refusing to grant Lincoln a new trial on the ground that the verdict was contrary to the weight of the evidence. On the contrary, our reading of the record convinces us that the weight of the evidence preponderates heavily in favor of the verdict, not against it.

### III. *The Instructions.*

On the day before the trial began the prosecution submitted several requested instructions to the district court; among these was one that indicated that both voluntary and involuntary manslaughter were lesser included offenses to the crime charged, and a combined instruction on these two offenses. During the trial Lincoln also submitted a requested instruction on the lesser included offense of simple assault. On the morning of the final day of trial the district court furnished counsel for both sides with its proposed instructions; the court proposed to include an instruction on the lesser included offense of voluntary manslaughter, but to omit the requested instructions on involuntary manslaughter and simple assault. A conference was duly convened prior to closing arguments for the purpose of permitting counsel to make their objections to the court's proposed instructions. During the conference defense counsel first stated that "we would take exception at this time to a lesser included instruction being submitted at all." He then said that if the court should determine to give its proposed instruction on the lesser included offense of voluntary manslaughter, it should also instruct on involuntary manslaughter, as requested by the government. No mention was made, however, of Lincoln's requested instruction on simple assault; in particular, no objection was ever made to its omission, nor was any basis in the evidence for such an instruction called to the attention of the district court. The court instructed neither on involuntary manslaughter nor on simple assault. Lin-

**1320**

coln now assigns these omissions as reversible error.

■■■■ A. *Involuntary manslaughter.* Involuntary manslaughter is the unlawful killing of a human being without malice

[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. § 1112(a). It is a lesser included offense to murder. *United States v. Hendrix*, 542 F.2d 879 (2d Cir. 1976), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1609, 51 L.Ed.2d 810 (1977). "In the federal courts, it has long been 'beyond dispute that the defendant is entitled to a [properly requested] instruction on a lesser included offense if the evidence would permit a jury to rationally find him guilty of the lesser offense and acquit him of the greater.'" *Beck v. Alabama*, —— U.S. ——, ——, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980) (quoting from *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973)). Since Lincoln properly preserved the point for plenary review, we must determine whether there was any evidence that would have permitted the jury to find him guilty of involuntary manslaughter but not guilty of either voluntary manslaughter or second degree murder. Only if there was such evidence did the district court err in refusing to instruction on involuntary manslaughter. *Cf. United States v. Thompson*, 492 F.2d 359, 362 (8th Cir. 1974).

■■■ It is clear that there was no evidence that Lincoln killed Robertson "in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." Nor, we believe, would the evidence permit the inference that he killed her "in the commission of an unlawful act not amounting to a felony." There was no evidence that Lincoln caused her death other than by committing an assault that resulted in serious bodily injury. But assault resulting in serious bodily injury is a felony. 18 U.S.C. §§ 113(f) and 1(1). Hence, if Lincoln killed Robertson at all, he did not kill her in the commission of an unlawful act not amounting to a felony. The district court did not err in refusing to instruction on involuntary manslaughter.

B. *Simple assault.* As we have noted, during the conference on instructions defense counsel made no mention of the district court's proposal to omit Lincoln's requested instruction on simple assault.[2] The instruction therefore was not given. On appeal, Lincoln for the first time presents the argument that there was a rational basis in the evidence for such an instruction. *See Beck v. Alabama, supra*, 100 S.Ct. at 2388. This argument, however, comes too late, especially given its minimal basis in the evidence introduced at trial.

The United States Court of Appeals for the District of Columbia Circuit was faced with almost the identical issue in *United States v. Lumpkins*, 439 F.2d 494 (D.C. Cir. 1970). In *Lumpkins*, a husband was charged with second–degree murder for killing his wife with a bottle. The jury convicted him of manslaughter. On appeal, he urged the appellate court to reverse his conviction because the trial judge did not instruct the jury on assault. The night of the murder, he and his wife had been drinking and quarrelling. A neighbor heard the sound of breaking glass. After police arrived, the husband admitted that he had earlier warned his wife that he would

2. While Lincoln uses the terminology "simple assault" in his brief, he cites to 18 U.S.C. § 113(d), (e) and (f). Only subsection (e) refers to simple assault. Subsection (e) refers to the common-law definition of assault, wherein a common-law battery is not necessarily involved. *See United States v. Stewart*, 568 F.2d 501, 504–05 (6th Cir. 1978). Subsections (d) and (f) are the relevant provisions in Lincoln's case. They provide: "Whoever * * * is guilty of an assault shall be punished as follows: (d) Assault by striking, beating, or wounding, * * * (f) Assault result–in serious bodily injury, * * *." 18 U.S.C. § 113(d), (f) (1976). *See United States v. Knife*, 592 F.2d 472, 482 (8th Cir. 1979).

"smack" her if she did not stop nagging. The next morning he could not remember whether or not he struck her. At the trial, the husband attempted to explain the death as a possible accident. Even the coroner admitted that the wound on the victim could have been caused by a fall on a piece of glass.

On appeal, the D. C. Circuit refused to find error in the trial court's failure to give an assault instruction. The court found that:

> [T]he denial of a lesser included offense instruction is not reversible error in the absence of a showing that the jury might rationally, at one and the same time, acquit of the greater charge (here manslaughter) and convict of the lesser (here, assault; or assault with a deadly weapon).
>
> * * * The showing of a rational basis for a simultaneous acquittal on the greater and conviction on the lesser offense is usually fairly inferable from the evidence given or the nature of the fact situation, and if not it should be specifically called to the attention of the trial judge. In this case the record does not reveal the necessary showing.

*United States v. Lumpkins, supra,* 439 F.2d at 496

■ We agree with the reasoning of the United States Court of Appeals for the District of Columbia Circuit with regard to the requirement of calling attention to the specific fact situation that would require giving the lesser included offense instruction. In Lincoln's case no such argument or presentation was made to the district court. Accordingly, we review the failure to give the instruction under the "plain error" standard. *See* F.R.Crim.P. 30; *United States v. Cady,* 495 F.2d 742, 747 (8th Cir. 1974).

The evidence presented to the jury, as we have found previously, *ante* at 1318 and 1319, was sufficient to sustain, and indeed preponderated heavily in favor of, the jury's verdict that Lincoln was guilty of voluntary manslaughter. The rationale

that an automobile struck the victim is extremely speculative. The evidence produced at trial demonstrated that Lincoln struck Robertson and left her lying on the ground in the roadway. Lincoln made no attempt to aid the victim in her helpless and unconscious condition. A few minutes later, the victim was discovered by a relative. There is no evidence that an automobile struck Robertson during these few moments. Under these facts, the failure to give a simple assault instruction was not error.

## IV. *Prosecutor's Remarks During Closing Argument.*

■ On this point we simply adopt the following portion of the district court's memorandum disposition of Lincoln's motion for new trial. *See United States v. Lincoln,* No. C2–79–52, slip op. at 4–5 (D.N.D. filed February 21, 1980):

> Defendant's final ground for a new trial [is] certain statements the prosecutor made in closing rebuttal argument. Medical testimony at trial showed that the victim's injuries were caused by something blunt. There was also evidence that the defendant had a screwdriver in his possession at the time of the alleged incident. There was, however, no testimony which would link the screwdriver as being a blunt instrument, or that it could have been used to inflict the victim's injuries. The screwdriver was never introduced into evidence.
>
> On his closing rebuttal argument, the prosecutor referred to the screwdriver as a blunt instrument and [suggested] that it could have been the cause of the victim's injuries. Defense counsel objected to the statement at that time.
>
> Assuming the statement was improper, a new trial is not required unless it would be so gross as probably to prejudice the defendant. *See United States v. Splain,* 545 F.2d 1131, 1135 (8th Cir. 1976). The defendant would be deemed prejudiced only if the jury verdict could have been affected by the argument. *Id.* In the

instant case there was substantial and persuasive evidence implicating defendant with the crime. Furthermore, when defense counsel objected to the statement, the court gave a curative instruction, admonishing the jurors that they should disregard any reference to matters in counsel's argument that [was] not supported by the evidence. This would have cured any prejudicial error. *See Clark v. United States*, 391 F.2d 57, 60–61 (8th Cir. 1968), *cert. denied*, 393 U.S. 873, [89 S.Ct. 165, 21 L.Ed.2d 143] (1968); *United States v. Parker*, 549 F.2d 1217, 1222–23 (9th Cir. 1977), *cert. denied*, 430 U.S. 971, [97 S.Ct. 1659, 52 L.Ed.2d 365] (1977). In light of these circumstances, the court holds that the prosecutor's statement could not have prejudiced the defendant so as to require a new trial.

AFFIRMED.