# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1673

_____

United States of America,          *
                                   *
            Plaintiff/Appellant,   *          Appeal from the United States
                                   *          District Court for the Northern
      v.                           *          District of Iowa
                                   *
Alfredo Huerta-Orozco              *
                                   *
            Defendant/Appellee.    *


_____

Submitted: September 11, 2001

Filed: November 19, 2001

_____

Before MORRIS S. ARNOLD and BRIGHT, Circuit Judges, and KYLE, District Judge.[1]


KYLE, District Judge.

Alfredo Huerta-Orozco was convicted by a jury of possession with the intent to distribute methamphetamine. The jury returned verdicts of guilty under each of the two theories advanced by the government: (1) that Huerta-Orozco personally committed the offense, and (2) that he aided and abetted another in the commission

_____

[1] The HONORABLE RICHARD H. KYLE, United States District Judge for the District of Minnesota, sitting by designation.

of that offense.  After the trial, Huerta-Orozco filed a motion for a judgment of acquittal or, in the alternative, a new trial.  The district court[2] denied the motion for a judgment of acquittal, but granted a new trial.  The United States appeals.  For the reasons set forth below, we affirm.

## I.

In late October 1999, Huerta-Orozco and Jose Ochoa-Heredia set out from California to Sioux City, Iowa.  They traveled by bus from Sacramento, California, to Omaha, Nebraska.  At about seven o'clock in the morning on October 31, 1999, Huerta-Orozco and Ochoa-Heredia hired a taxicab to take them from the Omaha bus station to Sioux City.  (Trial Tr. at 58-59).  The cost of the cab fare to Sioux City was approximately $175.00.  (Id. at 59.)  Ochoa-Heredia paid the driver $90.00 up front and told the driver that someone at the final destination in Sioux City would pay the rest of the fare.  (Id. at 60, 65.)

At approximately 8:30 a.m., Iowa state trooper John Mathis stopped the taxicab in which Huerta-Orozco and Ochoa-Heredia were passengers.  (Appellant's Addendum at 2, 9.)  Trooper Mathis had observed that the cab was speeding and pulled it over about ten miles south of Sioux City.  (Trial Tr. at 26-27, 68.)  After issuing the driver a warning, Trooper Mathis returned to the taxicab and asked Huerta-Orozco and Ochoa-Heredia for identification.[3]  (Trial Tr. at 31-33.)  In response to Trooper Mathis' questions, Ochoa-Heredia told him that they were coming from California. (Trial Tr. at 34.)  Trooper Mathis asked them if they had any baggage in the trunk. Ochoa-Heredia replied in the affirmative; Huerta-Orozco did

---

[2]  The Honorable Mark W. Bennett, Chief Judge, United States District Court for the Northern District of Iowa.

[3]  Ochoa-Heredia gave Trooper Mathis a resident alien card in the name of Jose Ochoa.  (Trial Tr. at 31.)  Huerta-Orozco provided Trooper Mathis with a false California driver's license.  (Trial Tr. at 32-33; Appellant's Addendum at 9.)

not respond. (Id. at 35-36.) Trooper Mathis then asked the men whether they had any weapons, contraband, or drugs – including marijuana – with them. (Id. at 36.) Ochoa-Heredia answered no to each question; Huerta-Orozco did not respond. (Id. at 37.)

Trooper Mathis asked if the men would mind opening their bags for him. Ochoa-Heredia agreed and got out of the cab. (Id.) Again, Huerta-Orozco did not respond. (Id.) The taxi driver opened the trunk, and Trooper Mathis saw three duffle bags -- one teal, one brown, and one blue.[4] (Id. at 38.) Ochoa-Heredia told Trooper Mathis that the brown bag was his.[5] (Id.) Ochoa-Heredia removed the teal bag from the trunk and opened it; Trooper Mathis asked for permission to check the contents of the bag, and Ochoa-Heredia consented. (Id.) Ochoa-Heredia next removed the brown bag from the trunk, opened it and consented to Trooper Mathis' search of the contents. The first two bags contained mostly clothing. (Id.)

Ochoa-Heredia then opened the blue bag and began to show Trooper Mathis the contents. (Id.) Trooper Mathis saw an object that looked like a twenty-ounce Gatorade bottle wrapped in duct tape and plastic wrap. (Id.) Trooper Mathis asked Ochoa-Heredia twice what the object was, and Ochoa-Heredia responded that he did

---

[4] Trooper Mathis described the three duffle bags as "lighter teal," "brown," and "darker teal." (Trial Tr. at 38.) For simplicity, the "lighter teal" bag will be referred to as "teal," and the "darker teal" bag will be referred to as "blue."

[5] There is contradictory testimony from Trooper Mathis and Ochoa-Heredia regarding whether Ochoa-Heredia said that the teal bag was his. Trooper Mathis testified that he did. (Trial Tr. at 38.) Ochoa-Heredia testified that he did not, he simply told the trooper that two of the bags were his and one was Huerta-Orozco's. (Id. at 188-89.) Similarly, there is contradictory testimony as to whether Ochoa-Heredia told Trooper Mathis that the blue duffle bag belonged to Huerta-Orozco. Trooper Mathis testified that Ochoa-Heredia stated before opening the blue bag that it was his friend's. (Id. at 39.) Ochoa-Heredia testified that he did not say that the blue bag was Huerta-Orozco's. (Id. at 188-89.)

3

not know.  (Id.)  Trooper Mathis asked Ochoa-Heredia several times if the blue bag belonged to him, and he said no.  (Id.)

At that point, Trooper Mathis directed Huerta-Orozco to step out of the cab and asked if the blue duffle bag was his.  (Id.)  Huerta-Orozco denied owning the blue bag and stated that the teal bag was his.[6]  (Id. at 40.)  Ochoa-Heredia stated that the brown bag was his.  (Id.)  At that point, both men denied any ownership or knowledge of the blue duffle bag.[7]  Trooper Mathis directed Huerta-Orozco to go back and sit in the taxicab;  Trooper Mathis then examined the blue bag more closely.  (Id. at 41.)  He discovered six bottles wrapped in duct tape and plastic wrap and a seventh round object, about the size of a baseball, also wrapped in duct tape and plastic wrap.  (Id.)  Trooper Mathis then radioed for assistance.  An officer from the canine unit of the Sioux City Police Department arrived with his dog; the dog reacted to all three bags in a way that indicated the presence of drugs.  (Id. at 69-70.)  The bottles in the blue bag all contained a liquid mixture which contained methamphetamine.  (Appellant's Addendum at 10.)

In response to Trooper Mathis' call for assistance, Department of Narcotics Enforcement Agent Kerry Northway also arrived at the traffic stop.  (See Trial Tr. at 83.)  Trooper Mathis had observed a cellular phone on Huerta-Orozco's person when he had stepped out of the cab.  (Id. at 45-46.)  Agent Northway seized the cell phone from Huerta-Orozco and, by hitting the last number redial button, determined that the last number called was (712) 899-2155.[8]  (Id. at 133.)  That telephone number was

---

[6]  In the teal bag were two cell phone chargers and batteries for the cell phone.  (Trial Tr. at 50, 87-88.)

[7]  Ochoa-Heredia later told the trooper that he had found the blue bag at the bus station; he acknowledged at trial that that story was not true.  (Trial Tr. at 190-91.)

[8]  We note that "712" is the area code used for Sioux City, Iowa.

also hand-written on a business card taken from Huerta-Orozco's wallet. (Id. at 134.)

The United States indicted Ochoa-Heredia and Huerta-Orozco on charges of possessing with the intent to distribute more than 500 grams of a mixture containing methamphetamine and aiding and abetting in that offense. Ochoa-Heredia subsequently pled guilty to possessing the methamphetamine with the intent to distribute it.[9] The case proceeded to trial against Huerta-Orozco.

At trial, the United States called five witnesses: three law enforcement officers who were involved in the traffic stop, the cab driver, and a criminologist who analyzed the contents of the bottles. Huerta-Orozco called Ochoa-Heredia as his only witness. Ochoa-Heredia testified that the blue duffle bag belonged to him and that Huerta-Orozco had no idea what was in the blue bag or that Ochoa-Heredia was transporting drugs. (Trial Tr. at 172.)

On cross-examination, Ochoa-Heredia stated that he had an agreement with a person named "Topo" to transport drugs from California to Sioux City in exchange for $2,500.00. (Id. at 181.) Ochoa-Heredia and Topo had agreed that Ochoa-Heredia would call Topo from a motel in Sioux City. (Id. at 182.) On their bus trip to Omaha, Ochoa-Heredia used Huerta-Orozco's cell phone to call Topo from Salt Lake City; at that time, Ochoa-Heredia gave Topo the number for Huerta-Orozco's cell phone. (Id. at 183.) Ochoa-Heredia kept Huerta-Orozco's cell phone with him for the rest of the trip to Omaha; after calling Topo in Salt Lake City, Ochoa-Heredia made no further calls and received no incoming calls. (Id. at 184.) In Omaha, Ochoa-Heredia returned the cell phone to Huerta-Orozco; during the taxi ride from Omaha to Sioux City, Ochoa-Heredia did not hear the cell phone ring or see Huerta-Orozco use the phone. (Id. at 184-85.) Ochoa-Heredia testified that Huerta-Orozco did not

_____

[9] Ochoa-Heredia testified that he pled guilty "because I made up that I had stolen the bag." (Trial Tr. at 194.)

know who Ochoa-Heredia was going to meet in Sioux City.  (<u>Id.</u> at 192.)

On November 2, 2000, the jury returned its verdict against Huerta-Orozco, finding him guilty of possession with the intent to distribute methamphetamine as both a principal and as an aider and abetter.  Huerta-Orozco brought a timely motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and, in the alternative, moved for a new trial pursuant to Federal Rule of Criminal Procedure 33.  The district court denied the motion for a judgment of acquittal, determining that the evidence, viewed in the light most favorable to the government, was sufficient to support the jury's verdict.[10]  The district court granted, however, the motion for a new trial.

## II.

The district court may grant a motion for a new trial "if the interests of justice so require." Fed. R. Crim. P. 33.  Where a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if

> . . . the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred. . . .  In making this determination, the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses.

<u>United States v. Lacey</u>, 219 F.3d 779, 783-84 (8th Cir. 2000); <u>see also</u> <u>United States</u>

---

[10] The district court carefully distinguished the legal standards applicable to a motion for judgment of acquittal and a motion for a new trial.  As the district court observed, "a judgment of acquittal should only be granted 'if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt.'"  (Appellant's Addendum at 4 (quoting <u>United States v. Gomez</u>, 165 F.3d 650, 654 (8th Cir. 1999).)

v. Brown, 956 F.2d 782, 786 (8th Cir. 1992); United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988).  If, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [the district court] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980).

We will reverse a district court's decision to grant a motion for a new trial if the district court abused its discretion.  United States v. Robbins, 21 F.3d 297, 299 (8th Cir. 1994); United States v. McBride, 862 F.2d 1316, 1319 (8th Cir. 1988).

> An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment.

United States v. West, 28 F.3d 748, 750 (8th Cir. 1994) (quoting United States v. Kramer, 827 F.2d 1174, 1179 (8th Cir. 1987)) (quotation marks omitted).  While the authority to set aside a jury verdict and grant a new trial "should be exercised sparingly and with caution," the trial court "has wide discretion in deciding whether to grant a new trial in the interest of justice."  Lincoln, 630 F.2d at 1319.

The government argues that the district court based its ruling "entirely on its conclusion that Ochoa's exculpatory trial testimony was more credible as compared to his pre-arrest statements implicating the defendant." (See Appellant's Brief at 22.) In so doing, the district court usurped the role of the jury in evaluating the credibility of Ochoa-Heredia's testimony, substituting its assessment of his credibility for the jury's. (Id. at 23.)  Thus, the government complains, the district court impermissibly reweighed the evidence and set aside the jury's verdict because it felt a different result was more reasonable. (See Appellant's Brief at 18.)  The government contends

that the jury's verdict "was supported by proof beyond a reasonable doubt," and criticizes the trial court for ignoring or discounting certain evidence.

A long line of authority in this circuit establishes that the district court can "weigh the evidence" and "evaluate the credibility of witnesses" in deciding whether to grant a new trial. See Lincoln, 630 F.2d at 1319. Indeed, this is "the fundamental procedure[] or methodology to be applied by the court in considering new trial motions." White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992). In the context of appeals from orders deciding new trial motions in civil cases, we have observed that many cases present "diametrically opposed testimony from credible witnesses with plausible versions, and the function of the jury is to accept one or the other." White, 961 F.2d at 781 (discussing Fireman's Fund Ins. Co. v. Aalco Wrecking Co., 466 F.2d 179, 187 (8th Cir. 1972), cert. denied, 410 U.S. 930 (1973), and Goldsmith v. Diamond Shamrock Corp., 767 F.2d 411 (8th Cir. 1985)). In such cases, where the choice is between two stories and reasonable jurors can differ in evaluating credible evidence, we have held that the trial judge should not grant a new trial motion on the grounds that the verdict is contrary to the weight of the evidence. See id.

The instant case involves much more, however, than a conflict between the testimony of two witnesses: Trooper Mathis on behalf of the government and Ochoa-Heredia on behalf of the defendant. The district court based its decision in large part upon the existence of numerous gaps in the government's case which, given the resources available to the government in prosecuting this case, are hard to explain. For example, the government sought to establish that Huerta-Orozco had "constructive possession" of the duffle bag containing the drugs. Such possession requires knowledge of presence of the contraband plus dominion over the place in which the contraband is concealed. United States v. Lemon, 239 F.3d 968, 969 (8th Cir. 2001). The district court observed, however, that there was no physical or scientific evidence (such as fingerprints), or eyewitness testimony linking Huerta-Orozco with the blue duffle bag containing the drugs. As for Huerta-Orozco's

8

knowledge that the blue duffle bag possessed drugs, the government presented evidence establishing only that Huerta-Orozco was acquainted (or, possibly, friends) with Ochoa-Heredia.

The government's alternative basis for the jury's conviction -- aiding and abetting the possession of methamphetamine with the intent to distribute -- centers on the use of Huerta-Orozco's cell phone to call "Topo." The evidence presented by the government established that (a) Huerta-Orozco's cell phone was used to call Topo from Salt Lake City and (b) there was a Sioux City telephone number written on a card in Huerta-Orozco's wallet that had been called from his phone. The district court observed, however, that the government failed to present evidence (such as telephone records for Huerta-Orozco's cell phone) that would concretely establish when the Sioux City telephone number had been called, and failed to produce records that would identify the person to whom the Sioux City telephone number was assigned.[11]

On the other side of the balance from the scant evidence the government did present are (a) the presumption of innocence and (b) Ochoa-Heredia's testimony

---

[11] The government asserts that the card found in Huerta-Orozco's wallet bore "Topo's" telephone number. (See Appellant's Brief at 21.) No evidence was presented at trial that in fact linked the telephone number bearing the (712) area code to Topo. It is a mere inference that the number on the card belonged to Topo, and a weak inference at that.

The government criticizes the district court for "speculating" that Huerta-Orozco could have called the (712) number at the Omaha bus station without being observed by Ochoa-Heredia, thus defeating the inference that the number Ochoa-Heredia called to speak to Topo and the number Agent Northway saw on the cell phone were the same. We note, from our review of the trial transcript, that Huerta-Orozco also apparently spent several minutes alone in the back of the taxicab while the bags in the trunk were being searched. He could have made a call at that time.

9

about his agreement and communications with "Topo" and the defendant's lack of knowledge of the same.[12]  The district court was <u>not</u> obligated to view the evidence in the light most favorable to the government.  <u>Lacey</u>, 219 F.3d at 784.  It was free to "discount" evidence and consider the record as a whole.  The "great weight" of the evidence -- the measure used to decide a new trial motion -- is quite distinct from the "abstract sufficiency of the evidence to sustain the verdict" -- the measure used to decide a motion for a judgment of acquittal.  Having reviewed the district court's decision and the trial transcript carefully, we cannot say that the district court gave significant weight to an improper or irrelevant factor.[13]  Nor can we say that the district court committed "a clear error of judgment" in weighing the factors that were considered.  The district court is in the best position to evaluate the strength of the government's case in light of the record as a whole.  We therefore conclude that the trial court did not abuse its discretion in granting a new trial to the defendant and affirm the order of the district court.

---

[12] The district court found that Ochoa-Heredia's "guilty plea sheds favorable light on the credibility of his testimony," and observed that he had "little or no incentive to minimize Huerta-Orozco's role in the offense."  To the extent the government asserts that Ochoa-Heredia had an incentive to lie on Huerta-Orozco's behalf, we find no evidentiary support for such a contention.

[13] The government criticizes the district court for having reasoned that Ochoa-Heredia would not have lied at trial because such conduct could enhance his sentence.  The government argues that the district court speculated as to whether Ochoa-Heredia had been advised that, if he lied on the stand, he was potentially subject to a two-level enhancement for willfully obstructing or impeding the administration of justice during the investigation or prosecution of the offense.  We conclude, viewing the record as a whole, that the district court did not give <u>significant weight</u> to this line of reasoning such that it rose to the level of an abuse of discretion.

10

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT