# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1033

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Corey Hilliard, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: November 19, 2004
Filed: December 28, 2004

_____

Before WOLLMAN and HEANEY, Circuit Judges, and HOLMES[1], District Judge.

_____

HEANEY, Circuit Judge.

Following his conviction and two direct appeals, Corey Hilliard was sentenced to four months in prison, four months in a community care facility, and three years of supervised release for aiding and abetting the illegal transfer of firearms, in violation of 18 U.S.C. §§ 2 and 922(a)(5). He filed a motion pursuant to 28 U.S.C.

_____

[1]The Honorable J. Leon Holmes, United States District Judge, for the Eastern District of Arkansas, sitting by designation.

§ 2255 seeking to have his conviction vacated. The district court[2] granted the motion, holding that Hilliard's trial counsel was ineffective for not timely filing a motion for a new trial. The government appeals, arguing that Hilliard failed to prove he was prejudiced by his lawyer's failure to file a new trial motion. We affirm.

## BACKGROUND

In 1994 and 1995, Eddie James and Larry Baskerville were involved in the illegal distribution of firearms. Baskerville had a permit to buy firearms, and purchased a substantial number of them from gun shows and pawn shops in Iowa. James and Baskerville then resold the guns, without a license to do so, to people in the Chicago area. See United States v. James, 172 F.3d 588 (8th Cir. 1999) (affirming James's conviction for illegally transferring firearms).

The government's case against Hilliard alleged that he was essentially the "steerer," or a person that helped James and Baskerville find buyers for their guns. On about September 17, 1994, Baskerville purchased firearms, and he and James then left for Chicago to sell them. James suggested that they stop by and see Hilliard, who lived in Chicago. Baskerville and Hilliard did not know one another, but Hilliard was close friends with James. Once they arrived at Hilliard's apartment, Baskerville asked to use Hilliard's phone to call some potential customers. Hilliard mentioned that an acquaintance of his, Walter Meeks, might want to buy a gun. Meeks had previously mentioned to Hilliard that he wanted a gun that was "legal" for his own protection. (Trial Tr. at 228.)

According to the testimony of James, Hilliard was under the impression that Baskerville was a licensed firearms dealer because Baskerville kept a receipt book,

_____

[2]The Honorable Mark W. Bennett, Chief Judge, United States District Court for the Northern District of Iowa.

2

the guns were all new and in boxes, and, importantly, because James himself affirmed that Baskerville was a legitimate dealer. Hilliard's testimony reflected this understanding. In response to a question about Hilliard's introduction to Baskerville, Hilliard responded:

> Well, the first time I met Larry [Baskerville], he was with Ed [James], and they were in Chicago, and it was just a regular conversation between them as far as "What's happening? What you doing? What's up? He tried to introduce me to Larry, which was this guy who said that he had a license to sell guns, and he was in Chicago selling guns, whatever, you know - -

(Id. at 225-26 (emphasis added).) Hilliard testified that before September 17, he had never met Baskerville, had no prior dealings in gun sales, and did not own a gun.

Baskerville followed up on Hilliard's comment that Meeks may want to buy a gun. Hilliard drove with Baskerville and James over to Meeks's house. Hilliard introduced Meeks to Baskerville, and told Meeks that Baskerville could sell him the type of pistol he wanted. Baskerville then sold Meeks firearms. Hilliard did not share in any of the proceeds or derive any other benefit from the deal. According to Hilliard, Baskerville and James returned to Chicago on September 18. They sought to return to Meeks's house, but did not remember the way. Hilliard drove with Baskerville and James in order to assist them in finding Meeks's house. Once there, Hilliard and James played pool while Baskerville and Meeks conducted their business.

Baskerville's testimony diverged at crucial points from the testimony of Hilliard and James. He testified that on September 17 and 18, 1994, he and James came to Chicago and sold guns directly to Hilliard. Hilliard and James testified that Hilliard did not buy any guns from Baskerville and that no guns ever entered

3

Hilliard's residence. James further testified that there was never any agreement for Hilliard to sell any guns.

Even though these events took place in the fall of 1994, Hilliard was not charged until 1998. He was indicted on four counts of aiding and abetting the illegal transfer of firearms, in violation of 18 U.S.C. §§ 2 and 922(a)(5), and one count of conspiring to illegally transfer firearms, in violation of 18 U.S.C. § 922(a)(5). The first four counts alleged that Hilliard helped Baskerville and James sell guns through separate transactions, occurring on different days, and involving different guns;[3] the conspiracy count alleged that Hilliard conspired to help Baskerville and James sell guns from a period starting in September of 1994 and ending around March of 1995.

At trial, Baskerville and James were the principal government witnesses, and Hilliard testified in his own defense. Neither Baskerville nor James could remember specifics well because of the lapse of time between the alleged acts and the trial, and did little to connect Hilliard to any of the gun sales. The government tried to establish Hilliard's involvement by introducing phone records showing that Baskerville and James often called Hilliard's pager. Hillard and Baskerville both testified, however, that Hilliard never returned Baskerville's pages; Hilliard and James testified that Hilliard sporadically returned James's pages.

---

[3]Count One alleged transactions occurring on or about September 17, 1994, and involving three Lorcin L380 pistols; Count Two alleged transactions occurring on or about September 18, 1994, and involving five Lorcin L380 pistols and one Lorcin L25 pistol; Count Three alleged transactions occurring on or about October 5, 1994, and involving two Lorcin L380-BB pistols, one Lorcin L-25-BB pistol, two Bryco 38-BB pistols, and one Bryco L380-BB pistol; and Count Four alleged transactions occurring on or about October 7, 1994, and involving one Bryco 59 pistol, one Davis LB-9 pistol, and two Norinco SKS/PARA rifles.

4

During the trial, Hilliard's counsel moved for a judgment of acquittal, which the district court reserved ruling on until the jury returned a verdict. The jury found Hilliard guilty of one count of aiding and abetting the illegal transfer of firearms to Meeks on or about September 18, 1994; he was acquitted of the other four counts, including conspiracy. The district court "remind[ed] defense counsel to check the rules for the requirements for filing post-trial motions and the time frames." (Jury Verdict Tr. at 3.) Hilliard's lawyer did not file a motion for a new trial until forty-one days after the verdict, although the Federal Rules of Criminal Procedure require the motion to be filed within seven days of the verdict. Fed. R. Crim. P. 33(b)(2). The district court dismissed the motion as untimely. At the district court's behest, Hilliard's counsel then moved to withdraw so that another attorney could determine whether to file a motion under § 2255 related to the failure to file timely post-trial motions. In considering the motion to withdraw, the district court stated, "I indicated at the – when I took the jury verdict that I had grave reservations about the jury verdict, and I instructed counsel to file post-trial motions." (Tr. of Apr. 21, 2000 Hr'g, at 2.) The court spoke to Hilliard directly about the propriety of the motion to withdraw:

> Mr. Hilliard, I want to make sure you understand what's happening. Your lawyer is moving to withdraw from the case. My intent is to appoint a new lawyer to represent you, [and] continue the sentencing. The new lawyer could then determine whether or not there are grounds to raise in a – what we call a 2255 proceeding. Here's what I don't want to happen, I don't want to go ahead and sentence you and then get into the issue of whether I have to postpone imposition of the sentence pending new counsel representing you and taking a look at whether it was error for [Hilliard's attorney] not to have filed a timely post-trial motion. And that's why I think new counsel should be appointed in the case, to take a look at that issue to make sure that your interests are fully protected. I'm not saying I'm going to grant relief. I'm just saying that my intent was to be able to look at the issues with a post-trial motion that was timely filed and a post-trial motion wasn't timely filed in this case, and therefore, I ruled that I lacked subject matter jurisdiction to

5

> review the matter based on an untimely filed post-trial motion. So it's my intent to try and make sure your interests are fully protected by appointing new counsel to take a look at the issues and we'll see where we go from there.

(Id. at 4-5.) Hilliard agreed it was in his best interest to have his trial attorney replaced by new counsel, and the district court accordingly granted the motion to withdraw.

On September 28, 2000, Hilliard was then given a three-year probationary sentence that included a six-month term of home confinement. The government successfully appealed the sentence, arguing the district court erred by imposing Hilliard a four-level role reduction. United States v. Hilliard, 16 Fed. Appx. 533 (8th Cir. 2001) (unpublished per curiam). On remand, the district court resentenced Hilliard without the role reduction to fifteen months in prison. Hilliard then successfully appealed, and we remanded for the district court to consider whether some role reduction less than four levels was appropriate. United States v. Hilliard, No. 02-1034 (8th Cir. May 9, 2002) (unpublished interim order). The district court found a three-level reduction was appropriate, and arrived at a sentence for Hilliard of four months in prison, four months in a community corrections center, and three years of supervised release. Our court summarily affirmed pursuant to Eighth Circuit Rule 47A. United States v. Hilliard, No. 02-1034 (8th Cir. Apr. 1, 2003).

On January 6, 2003, Hilliard filed the instant § 2255 petition, arguing, inter alia, that his trial attorney was ineffective for not filing a timely motion for a new trial.[4] The district court found that trial counsel's failure to file a timely motion for a new trial on behalf of Hilliard, simply because he mistook the filing deadline, fell

---

[4]The execution of Hilliard's sentence was stayed pending the disposition of the § 2255 petition. The government appealed the order staying the execution of Hilliard's sentence during his § 2255 proceedings, and we summarily affirmed.

6

below an objectively reasonable standard of professional conduct. The court further held that Hilliard had demonstrated he was prejudiced by counsel's failings because the court would have likely granted the new trial motion. This appeal followed.

## ANALYSIS

We review the district court's decision to grant or deny relief on a petitioner's ineffective assistance of counsel claim de novo. United States v. White, 341 F.3d 673, 677 (8th Cir. 2003). The test for judging whether a criminal defendant was deprived the effective assistance of counsel is a familiar one:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984); United States v. Farmer, 312 F.3d 933, 937 (8th Cir. 2002).

In determining whether counsel's performance fell below a constitutionally-acceptable standard, courts must distinguish claims that involve deficient performance from those which reflect permissible trial strategy. Strickland, 466 U.S. at 690-91. While "[w]e presume counsel's conduct to be within the range of competence demanded of attorneys under like circumstances. . . . [W]hen the appellant shows that defense counsel 'failed to exercise the customary skills and diligence that a reasonably competent attorney would exhibit *under similar circumstances,*' that presumption must fail." Starr v. Lockhart, 23 F.3d 1280, 1284

7

(8th Cir. 1999) (quoting Hayes v. Lockhart, 766 F.2d 1247, 1251 (8th Cir. 1985)) (emphasis added in Starr).

In this case, there can be no serious argument that the performance of Hilliard's lawyer was acceptable. He admitted in deposition testimony that he failed to timely file a motion for a new trial because he misapprehended the filing deadline. Not filing a dispositive motion, particularly when directed to do so by the district court, is a classic dereliction of an attorney's obligation to provide his client with the type of performance required by the Sixth Amendment. Accord Hollis v. United States, 687 F.2d 257, 259 (8th Cir. 1982) (holding that counsel's failure to timely appeal his client's case demonstrated "such an extraordinary inattention to a client's interests as to amount to ineffective assistance" (quoting Williams v. United States, 402 F.2d 548, 552 (8th Cir. 1968))).

We must next ascertain whether Hilliard has shown he was prejudiced by his lawyer's mistake. To do so, he must show that absent the mistake, there is a "reasonable probability" that the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. This determination turns on whether or not there was an appropriate basis for granting Hilliard's new trial motion had it been timely filed. See, e.g., DeRoo v. United States, 223 F.3d 919, 926 (8th Cir. 2000) (finding no prejudice where counsel's alleged deficiency was not filing a motion to dismiss the indictment and there was no "reasonable probability" the motion would have been successful); see also Butcher v. United States, 368 F.3d 1290, 1294-95 (11th Cir. 2004) (reviewing the merits of petitioner's untimely new trial motion to determine if he was prejudiced by counsel's failure to timely file it).

Federal Rule of Criminal Procedure 33 accords the district court the power to "vacate any judgment and grant a new trial if the interest of justice so requires." The court may grant a new trial motion where it finds that the verdict is "contrary to the weight of the evidence," United States v. Huerta-Orozco, 272 F.3d 561, 565 (8th Cir.

8

2001), and the decision to grant or deny such a motion rests "within the sound discretion of the trial court," United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). The court should grant the motion where the evidence presented weighs heavily enough against the verdict that the court believes a "miscarriage of justice may have occurred." Huerta-Orozco, 272 F.3d at 565 (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). Unlike a motion for acquittal, which requires the district court to consider all evidence in the light most favorable to the guilty verdict, a court considering a new trial motion is free to evaluate the evidence and credibility of the witnesses. Id. at 565, 567; see also United States v. Espinosa, 300 F.3d 981, 983 (8th Cir. 2002) (recognizing that "[t]he standard for granting a motion for new trial is somewhat less exacting [when compared to a motion for acquittal] because the evidence need not be viewed in the light most favorable to the government").

Against this backdrop, Chief Judge Bennett concluded that the trial evidence "weighs heavily enough against the verdict for the court to conclude that a miscarriage of justice may have occurred," remarking that it was "an extraordinarily close call." (Appellant's Addendum at 19.) The court noted that the government's case-in-chief rested largely on the testimony of James and Baskerville, and that both witnesses had serious credibility problems, exemplified by their equivocal testimony and lapses in memory. He further observed that the testimony of the two witnesses was often contradictory. Recognizing that Hilliard was convicted of only one of the five charged counts even though the evidence for all five overlapped, the court opined that the weakness of the evidence may have been the reason for the inconsistent verdict. After independently evaluating the evidence, the court held that "a miscarriage of justice was likely done here," and thus it would have granted the motion for a new trial if timely filed. (Id. at 20.)

In its brief, the government contends that the testimony of James and Baskerville was sufficient to convict Hilliard, recounting in great detail the different

9

transactions to which their testimony connected Hilliard. A review of the trial transcript, however, reveals that this testimony principally related to those charges that resulted in acquittals. Thus, this evidence does nothing to convince us that Hilliard's offense of conviction should stand.[5] More importantly, though, this argument evinces a misunderstanding of analysis undertaken in new trial motions. In granting relief to Hilliard, the district court did not take issue with the *extent* of the government's evidence; it found problems with the *quality* of the evidence. Certainly, the government's evidence was strong enough to withstand a motion for judgment of acquittal, where the district court does not weigh evidence or consider the credibility of witnesses. Indeed, we have already held as much. See United States v. Hilliard, 16 Fed. Appx. 533 (8th Cir. 2001) (unpublished per curiam) (affirming the denial of Hilliard's motion for judgment of acquittal). But in a new trial motion, the district court is to "weigh the evidence and evaluate for itself the credibility of the witnesses." Huerta-Orozco, 272 F.3d at 565 (quoting United States v. Lacey, 219 F.3d 779, 784 (8th Cir. 2000)). The motion may even be granted where there is "substantial evidence to sustain the verdict." Campos, 306 F.3d at 579 (quoting White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992)). The district court presided over Hilliard's trial, and had a first-hand opportunity to judge the credibility of the government's witnesses. It was the district court's prerogative to find the testimony of Baskerville and James so unreliable that a conviction based on that testimony could not stand and, after independently reviewing that testimony, we find no error in the district court's conclusion.

The government further argues that, even without the government's evidence, Hilliard was proven guilty by his own testimony. It points to Hilliard's admission that he knew it was not legal to buy guns in Chicago, and suggests that this means he

---

[5]If anything, pointing to testimony from James and Baskerville that concerned the other four counts *supports* the district court's conclusion that the two were not reliable witnesses, since Hilliard was acquitted of those charges.

had knowledge that sales to Meeks involved an illegal transfer. This argument is unavailing. In order to prove Hilliard aided and abetted the illegal transfer of firearms in violation of 18 U.S.C. §§ 2 and 922(a)(5), the government had to prove that he knew the illegal transfer firearms was being committed and knowingly acted in some way to aid or cause the commission of that offense. See United States v. Hernandez, 301 F.3d 886, 890 (8th Cir. 2002) (holding that to prove a defendant guilty of aiding an abetting an offense, government must show that defendant associated herself with an unlawful venture, participated in it as something she wished to bring about, sought by her actions to make it succeed, and shared the criminal intent of the principal). "Illegal," as used here, is a term of art, which refers to a transfer in which the transferor is not a licensed firearms importer, manufacturer, dealer, or collector. 18 U.S.C. § 922(a)(5). Thus, the fact that Hilliard had knowledge that gun sales in Chicago were prohibited does not satisfy the elements of the charged offense, which required proof that Hilliard knew Baskerville was not licensed to make firearms transfers. Hilliard's testimony was just the opposite: Baskerville told Hilliard he was a licensed firearms dealer, and Hilliard's friend James affirmed that the sales were legitimate. Thus, the government cannot rely on Hilliard's testimony to establish that he knew Baskerville was not licensed to transfer firearms.

## CONCLUSION

The government appeals the district court's grant of § 2255 relief related to Corey Hilliard's 1999 conviction for one count of aiding and abetting the illegal transfer of firearms in 1994. We agree with the district court that Hilliard's trial attorney was ineffective for not filing a timely motion for a new trial, and that Hilliard was prejudiced because the motion would have properly been granted. Accordingly, we affirm the district court.

_____

11